475 So.2d 1228 (1985)
Ernest Lee ROMAN, Appellant,
v.
STATE of Florida, Appellee.
No. 63766.
Supreme Court of Florida.
August 30, 1985.
Rehearing Denied October 23, 1985.
*1229 Robert Q. Williams and Christopher J. Smith of Williams and Smith, Tavares, for appellant.
Jim Smith, Atty. Gen. and Margene A. Roper, Asst. Atty. Gen., Daytona Beach, for appellee.
PER CURIAM.
This cause is before us on appeal from convictions of premeditated first-degree murder, kidnapping and sexual battery, and sentence of death imposed in accordance with the jury's recommendation. We have jurisdiction pursuant to article V, section 3(b)(1), Florida Constitution.
In March of 1981 appellant was living with Arthur Reese in a travel trailer adjacent to his sister's mobile home. On the evening of March 13 several persons were at the mobile home, including appellant, appellant's sister Mildred Beaudoin, her son Ray, Reese, Kellene Smith, mother of the two-year-old victim Tasha Marie Smith and Kellene's boyfriend Chip Mogg. Smith and Mogg arrived sometime between 9:30 and 11 p.m. and left Tasha Marie asleep in the back seat of Mogg's car.
*1230 Smith testified that she checked the baby around midnight, and she was sleeping. Shortly thereafter, Mogg drove Ray Beaudoin a short distance to work with the baby asleep in the back seat of the car. Smith and Mogg departed the gathering five to twenty minutes after Mogg returned without checking the back seat for the baby. Mildred Beaudoin testified that appellant left fifteen to twenty minutes before Smith, Mogg, and Reese, who all left at the same time. Reese went straight to the travel trailer. Appellant came in later, went to his bed for four or five minutes, and then left.
Smith and Mogg discovered the baby was missing, returned to the mobile home, and searched for approximately two hours before notifying the police. Appellant was not in the travel trailer around 3 a.m., but was seen later walking from the direction of an abandoned trailer about 300 yards up the hill from the Beaudoin mobile home. Appellant at the time denied having seen the baby.
Tasha Marie Smith's body, wrapped in a pink bedspread and naked from the waist down, was discovered in a shallow grave at approximately 12:30 p.m. on March 14. The grave site, which was partially covered by a plastic refrigerator pan and a metal refrigerator ice making unit, was approximately thirty-seven feet from the abandoned trailer.
Autopsy results revealed that an object was forced into the baby's vagina and agitated. The results were consistent with repeated penetration by the finger of an adult male. Death by asphyxiation occurred somewhere between 2 and 3 a.m. Sand and dirt in the breathing tube and stomach indicated she had breathed in and swallowed dirt while alive. The tips of her fingernails, folded and broken with dirt caked underneath them, indicated that she had struggled to escape.
The state's experts testified that on the bedspread in which Tasha Marie's body was found they discovered two pubic hairs and a scalp hair that were consistent with appellant's hair. Fibers from appellant's clothes were on the baby's T-shirt. Appellant's clothing also contained fibers that came from bed coverings in the abandoned trailer. One of the baby's shoes was found under a bed in the abandoned trailer, the other under appellant's trailer.
When the ambulance came for the body, Mildred Beaudoin collapsed and was assisted inside by Douglas Calvert, a neighbor, who testified that Beaudoin immediately called her sister and stated, "Ernest has killed a baby, I reckon."
Sergeant Foremny of the Sumter County Sheriff's Department found appellant and asked him to accompany the officer to the crime scene. Appellant complied, was read his Miranda rights, and was subsequently asked if he would accompany the officers to the jail; he agreed.
There was testimony that appellant was not handcuffed and that he arrived at the jail at 4:51 p.m. Following re-advisal of his Miranda rights, appellant was interrogated by Sheriff Adams and Deputies Galvin and Thompson starting at 6:32 p.m. According to the deputies' testimony, probable cause to arrest did not exist at this time, and appellant had the right to leave prior to his confession, which was given sometime after 10 p.m. The sheriff testified that he would not have allowed appellant to leave, but Sergeant Thompson testified that had appellant exercised his right to leave, he would have explained to the sheriff that there was no alternative but to allow him to do so. During the course of the interrogation, the "Christian burial technique" was used on appellant. That is, even though the body already had been recovered, appellant was told of the need to recover the body for purposes of a Christian burial. According to the sheriff, appellant ultimately made an incriminating statement when two photographs of the young victim while still alive were shown him.
Sometime between 9:30 and 10:30 p.m., C.J. Coniglio, an attorney called by appellant's sisters in his behalf, called the sheriff's office and requested that appellant not be questioned until he had benefit of counsel. *1231 He testified that the sheriff's response was that they were "about through anyway."

GUILT PHASE
Appellant's first point is that his confession should have been suppressed because:
(1) he did not make a knowing and intelligent waiver of his Miranda rights;
(2) the confession was the fruit of an illegal arrest;
(3) he was denied his right to counsel because he was not told of Coniglio's attempted intervention in his behalf.
Appellant's arguments on this issue presuppose that he was in custody during the time he was interrogated. In determining whether a suspect is in custody, "the ultimate inquiry is simply `whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" California v. Beheler, 463 U.S. 1121, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (quoting Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct 711, 714, 50 L.Ed.2d 714 (1977)). This inquiry is approached from the perspective of how a reasonable person would have perceived the situation. Drake v. State, 441 So.2d 1079 (Fla. 1983), cert. denied, ___ U.S. ___, 104 S.Ct. 2361, 80 L.Ed.2d 832 (1984). "A policeman's unarticulated plan has no bearing on the question of whether a suspect was `in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, ___ U.S. ___, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (footnote omitted). Appellant's situation was that he was being questioned in an investigation room at the sheriff's department, having voluntarily complied with a deputy's request to go there. That an interrogation takes place at a station house does not by itself transform an otherwise noncustodial interrogation into a custodial one. Mathiason. The defendant in Drake was aware that he had furnished the police with probable cause for his arrest. This knowledge, coupled with the fact that his request to discontinue further interrogation without counsel went unheeded, afforded a reasonable basis for Drake to believe he was not free to leave. Appellant here has shown no similar basis for a reasonable belief that there was a restraint on his freedom of movement of the degree associated with a formal arrest.
In Beheler and Mathiason the Supreme Court found a station house interrogation not to constitute custody for purposes of requiring Miranda warnings. Those cases differ from the present case in three respects: the defendants in Beheler and Mathiason were specifically informed that they were not under arrest, the questioning in those cases lasted less than thirty minutes, and the defendants were allowed to leave after making their statements, although they were ultimately charged with the crimes being investigated. We agree that a reasonable person might be more likely to think he is not in custody if specifically told he is not under arrest. Conversely, some reasonable persons might assume they are not in custody unless told otherwise. We therefore find that this factor is one to be considered as a circumstance that has bearing on a suspect's perception of his situation, but that it, like the station house location, is not dispositive. As for the length of time of the interrogation, in some cases it might make a difference. We find that the time factor was not unreasonable in the present case and would not have contributed to a perception of custody.
The facts the Supreme Court had before it in Beheler and Mathiason happened to involve situations where suspects were not immediately arrested after making inculpatory statements. We find, however, that the controlling principles of those cases can be applied to a situation involving an arrest following the statement. Indeed, occasions would be rare when a suspect would confess to committing a murder and then be allowed to leave. Certainly the noncustodial atmosphere leading up to a confession and probable cause would thereby be expected to be *1232 converted to a custodial one. But we do not find that arresting a suspect following a confession converts what theretofore had been a noncustodial situation into a custodial one. In determining that a suspect was not in custody, it does not have to be found that the environment in which he was questioned was devoid of coercion. Indeed, common sense tells us that questioning of a suspect by police at the station house is inherently coercive. As the Court stated in Mathiason:
Such a noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was that sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited.
Mathiason, 429 U.S. at 495, 97 S.Ct. at 714. We fail to find that a reasonable person in appellant's position prior to giving his statement, having voluntarily accompanied the officers to the station house, would have perceived a restraint on his freedom of movement of the degree associated with a formal arrest.
Appellant also argues that his confession was involuntary. The state has the burden to show by a preponderance of the evidence that the confession was voluntary. Nowlin v. State, 346 So.2d 1020 (Fla. 1977). We review the trial court's ruling by viewing the totality of the circumstances. Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).
Appellant argues that his mental condition rendered his confession involuntary because the state's witness, psychiatrist George Barnard, testified at the suppression hearing that his intelligence was dull normal and he probably had some organic brain damage due to chronic alcoholism.
At the hearing on the motion to suppress, Dr. Barnard testified that he found no overt indication of mental illness at the time of the statement nor any indication of intoxication. He stated that dull normal is at the lower end of average intelligence, assessed as neither retarded nor exceptionally bright. The sheriff and deputies testified that appellant was read Miranda warnings and that he indicated verbally that he understood them, that he was given no promises or threats, that he appeared understanding and did not appear intoxicated, that he was given coffee and water, and that he refused food.
Proof that Miranda warnings were given is relevant in determining whether there was coercion. Beckwith v. United States, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). Proof even of partial warnings of constitutional rights is a circumstance relevant to a finding of voluntariness. Frazier v. Cupp. The state's evidence demonstrates that the rights were read and understood. Our examination of the entire record shows that appellant offered several times to sign the Miranda card after completing his taped statement.
The use of the "Christian burial technique" by law enforcement personnel is unquestionably a blatantly coercive and deceptive ploy. The record shows, however, that the use of this tactic did not directly result in appellant's statement, although we consider it as a factor among the totality of circumstances surrounding the giving of this statement. The record reflects that appellant was a forty-five year *1233 old man of intelligence within the normal range, albeit at the lower end. He did not appear intoxicated or mentally ill at the time. He was read Miranda warnings, was capable of understanding them, and indicated that he did in fact understand them. He was offered sustenance and not promised or threatened. He was not handcuffed, and despite vomiting and trembling seemed alert and perceptive. Under these circumstances we find that the deception was insufficient to make an otherwise voluntary statement inadmissible. See Harris v. State, 438 So.2d 787 (Fla. 1983), cert. denied, ___ U.S. ___, 104 S.Ct. 2181, 80 L.Ed.2d 563 (1984).
As for appellant's argument regarding his right to counsel, the question is whether police officers questioning a suspect in a noncustodial setting must comply with an attorney's request that they cease questioning the suspect and then inform the suspect of the attorney's call. We think not. Appellant in this case made a voluntary statement. Sheriff Adams was not required to comply with the attorney's telephone request that he cease conducting a lawful interrogation or inform appellant that he had received the request. We find no error.
Appellant's next argument is that the trial court erred in denying the defense motion for mistrial when witness Douglas Calvert testified that he had overheard appellant's sister say that "Ernest has killed another baby, I reckon." The court reporter's notes indicated "ano" rather than "another." Defense counsel argued he heard "another" clearly. The state argued that it sounded like "an uh," so that the jury would not possibly have heard "another." A tape recording of the answer was made a part of the record, and our perception is that the jury would not have heard or inferred "another."
Appellant argues that even without "another," the statement was improperly admitted because it was hearsay and because there was no predicate laid to demonstrate that Beaudoin had personal knowledge that her brother had killed the baby. We need go no further than section 90.604, Florida Statutes (1981):
90.604 Lack of personal knowledge.  Except as otherwise provided in s. 90.702, a witness may not testify to a matter unless evidence is introduced which is sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove knowledge may be given by the witness himself.
Clearly Beaudoin's statement was inadmissible. This error was not fundamental, however, and is therefore subject to harmless error analysis. See section 924.33, Florida Statutes (1981). We find that the properly admitted evidence against appellant, including his statement and the circumstantial evidence, was sufficiently overwhelming so as not to justify reversal. There is no reasonable possibility that the error may have contributed to appellant's conviction. See Palmes v. State, 397 So.2d 648 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981).
Appellant's next point is that the trial court erred in denying the defense motion for mistrial when the prosecutor asked Beaudoin:
Isn't it a fact that you talked to your brother before he was arrested, and he told you what happened?
Defense counsel based his motion upon the prosecutor's having no factual basis for inferring that appellant had told his sister what happened. After the trial court denied the motion, the following transpired:
Q. Would it refresh your recollection if I reminded you that you said, "Ernie has killed a baby, I reckon."
A. I do not remember what I said on the phone. I was too upset, too hysterical  wouldn't you be?
Appellant argues that the suggestion that appellant had told his sister what happened was improper and erroneous, because the jury probably thought the prosecutor would not allude to something that had not transpired. We agree that the prosecutor's questions were improper. However, we find that this error does not require reversal, *1234 in that defendant's actual confession was before the jury. Whether the jury thought Beaudoin was lying would have assumed far greater significance had there been no confession introduced. But that is not the case, and we affirm as to this point.
Appellant's next point is that the trial court erred in denying the motion for mistrial when the following transpired between the prosecutor and Sergeant Galvin:
Q. In the course of the investigation, once you focused upon the Defendant, Ernest Roman, as the person who had committed these crimes, did you have occasion to look at his records in the Sumter County Sheriff's Department?
A. Yes, I did.
The defense motion was based on the grounds that the question implied that appellant had a prior criminal record. The trial court sustained the objection to the question, but denied the motion for mistrial. The defense requested a curative instruction, but withdrew the request when the trial court advised that the instruction "is going to imprint it on their minds more." The prosecutor stated as justification for his question that he merely sought to establish a pattern of malingering on appellant's part whenever he came into contact with the law. The state argues now that the error was waived by defense counsel withdrawing the request for a curative instruction and that it would be unfair not to allow the state to show appellant's history of claiming mental illness upon encounters with the law, his having put his sanity in issue at trial. Appellant argues that the prosecutor's real motive was to suggest to the jury that appellant had a propensity to commit crime. We agree that this question was improper, as its sole relevance was to show appellant's criminal history. We also do not find that defense counsel waived the issue. Nonetheless, as in Straight v. State, 397 So.2d 903 (Fla.), cert. denied, 454 U.S. 1022, 102 S.Ct. 556, 70 L.Ed.2d 418 (1981), we find no reversible error because of the overwhelming evidence against appellant.
As appellant's last point relating to the guilt phase, he contends that the trial court erred in failing to instruct the jury that the state had the burden of proving beyond a reasonable doubt that appellant was legally sane at the time of the commission of the offense. Appellant did not preserve this point, as he did not request the trial court to give this instruction. We find no error.
We have reviewed the entire record, find the evidence more than sufficient to support appellant's convictions, and find no reversible error.

PENALTY PHASE
In imposing the death penalty, the trial court found three aggravating circumstances: that the defendant had previously been convicted of a felony involving the threat of violence to another person, that the capital felony was committed while the defendant was engaged in the commission of a sexual battery and kidnapping, and that the murder was especially heinous, atrocious, or cruel. He found as a mitigating circumstance that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
Appellant does not challenge the aggravating factors found by the trial court, but rather asserts that the jury should have been instructed on the statutory mitigating circumstance of extreme mental or emotional disturbance at the time the capital felony was committed. The standard jury instructions instruct the judge to give instructions on only those aggravating and mitigating circumstances for which evidence has been presented. At the sentencing hearing, the defense put on two psychiatrists as witnesses regarding appellant's mental condition. During discussion with counsel as to the applicability of the extreme mental or emotional disturbance factor, the following transpired:
MR. POWER: Well, we would contend that there is enough evidence for an instruction as to number 2, the crime for *1235 which the defendant is to be sentenced was committed while he was under the influence of extreme mental or emotional disturbance. I know the Doctors were equivocal on that, but we would request an instruction based on it, the alcoholism, the other symptoms of some organic damage, based on that we would request number 2. And, I would point out that the burden of proof for mitigating circumstances is less than that for aggravating circumstances. That is later on in the instructions. Mitigating circumstance need not be proved beyond reasonable doubt. I would contend that it is at least raised to the point where it should be instructed.
MR. BROWN: My position is, I object to it. The note to Judge, says "give only those mitigating circumstances for which evidence has been presented." There has not been any testimony presented that the defendant was under the influence of extreme mental or emotional disturbance. All the testimony went to whether his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. None of the testimony went to extreme mental or emotional disturbance. None of the witnesses were ever asked that question. There is absolutely no evidence of that at all. The entire defense presentation went to number 6. There was not the first thing about extreme mental or emotional disturbance, not the first question. And as far as the testimony from phase one, that went to whether he knew right from wrong, knew the nature and quality of his acts. There is nothing anywhere in the record about extreme mental or emotional disturbance.
MR. POWER: I think the record is replete with testimony concerning his lengthy abuse of alcohol and again we briefly get to the point where medicine and law, you just can't fit the terms and I believe it is raised to the point where the jury should be instructed.
MR. BROWN: We feel that the evidence only went to number 6, as opposed to number 2.
THE COURT: It seems to me like 6 would cover it.
* * * * * *
THE COURT: I think they are talking about a different thing than the evidence showed that was presented in this trial. I think that the influence of extreme mental or emotional disturbance  I think that goes to a different type of situation than was presented here. I don't think it covers what you are wanting. I think that you would be, the procedures are so liberal in the second stage, I think you can properly bring it in under 6.
MR. BROWN: 6 and 8.
THE COURT: Yes, and 8.
MR. POWER: I did intend to request 8. I just would maintain my request for 2.
THE COURT: I will overrule your request for 2. For the reasons I indicated. I don't believe that the evidence that was submitted in the trial proper or the second phase was that which is contemplated by 2.
Thus the trial court concluded that the evidence warranted an instruction on substantial impairment, but not on extreme mental or emotional disturbance. Under the evidence adduced at both the guilt and penalty phases of appellant's trial, we find that the trial court did not err in refusing to give the requested instruction. The two mitigating circumstances involving mental state describe two different mental states, which may, but do not necessarily, overlap. In this instance they did not.
Appellant's remaining point is totally without merit.
For the reasons expressed, and comparing the sentence of death in this case with previous cases, we find no basis for reversal. We affirm the convictions and the imposition of the death sentence and the sentences for kidnapping and sexual battery.
*1236 It is so ordered.
AS TO CONVICTION:
ADKINS, ALDERMAN, EHRLICH and SHAW, JJ., concur.
McDONALD, J., concurs in result only.
OVERTON, J., dissents with an opinion, in which BOYD, C.J., concurs.
AS TO SENTENCE:
ADKINS, ALDERMAN, McDONALD, EHRLICH and SHAW, JJ., concur.
OVERTON, J., dissents with an opinion, in which BOYD, C.J., concurs.
OVERTON, Justice, dissenting.
I dissent. Although the facts clearly seem to justify the imposition of the death penalty in this heinous crime, I find the multiple errors in the trial of this case, most of which are recognized in the majority opinion, are such that I cannot conclude they are harmless. Due process, in my opinion, requires a new trial.
BOYD, C.J., concurs.