529 So.2d 1083 (1988)
Harold Lee HARVEY, Appellant,
v.
STATE of Florida, Appellee.
No. 69101.
Supreme Court of Florida.
June 16, 1988.
Rehearing Denied September 16, 1988.
*1084 Robert G. Udell of Robert G. Udell, P.A., Stuart, for appellant.
Robert A. Butterworth, Atty. Gen. and Lee Rosenthal, Asst. Atty. Gen., West Palm Beach, for appellee.
PER CURIAM.
Harold Lee Harvey appeals his two convictions for first-degree murder and sentences of death. We have jurisdiction pursuant to article V, section 3(b)(1), Florida Constitution, and affirm both the convictions and sentences.
On February 23, 1985, Harold Lee Harvey met with Scott Stiteler, his codefendant at trial, and drove to the home of William and Ruby Boyd, intending to rob them. Upon their arrival, Stiteler knocked on the front door. In the meantime, Harvey grabbed Mrs. Boyd as she was walking around from the side of the house and took her into the house where Mr. Boyd was located. Harvey had a pistol and Stiteler was holding Harvey's AR-15 rifle which had recently been converted into an automatic weapon. Harvey and Stiteler told the Boyds they needed money. Mr. Boyd then went into the bedroom and got his wallet. Sometime during the course of the robbery, Harvey and Stiteler exchanged guns so that Harvey now had possession of the automatic weapon. After getting the money from the Boyds, Harvey and Stiteler discussed what they were going to do with the victims and decided they would have to kill them. Sensing their impending danger, the Boyds tried to run, but Harvey fired his gun, striking them both. Mr. Boyd apparently died instantly. Harvey left the Boyds' home but reentered to retrieve the gun shells. Upon hearing Mrs. Boyd moaning in pain, he shot her in the head at point blank range. Harvey and Stiteler then left and threw their weapons away along the roadway.
On February 27, 1985, Harvey was stopped for a driving infraction in Okeechobee County and subsequently placed under arrest for the Boyds' murders.[1] He was read his Miranda rights at that time. He was then transported to the Okeechobee County Sheriff's Department and again read the Miranda warning. Harvey was questioned and interrogated, and after speaking with his wife, gave a statement in which he admitted his involvement in the Boyds' murders.
On May 11, 1986, Harvey escaped from the Okeechobee County Jail. He was located sleeping in a truck the following day by a North Miami Beach police officer. When the officer woke him up, Harvey pointed a gun in the officer's face. After the officer fired his gun, Harvey jumped in the police car and fled the scene. After a car chase through the city, Harvey was finally subdued.
Harvey raises eleven issues on this appeal, five of which merit discussion.[2] *1085 The first issue concerns whether Harvey's incriminating statements to the police should have been suppressed because he was not told that a public defender, who had heard that Harvey had been arrested for the Boyds' murders, was at the jail to talk with him.[3] Before giving his statement to law enforcement officials, Harvey had signed five forms waiving his right to counsel under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The public defender arrived at the jail between approximately 2:00 and 2:25 P.M. and requested to speak with Harvey but was not allowed to do so. While at the jail, the public defender spoke with other clients, including Harvey's codefendant, Scott Stiteler. The tape of Harvey's confession began at 2:22 P.M., and the public defender was first allowed to speak with Harvey at 6:00 P.M., after Harvey had given his statement but prior to his first appearance before the local judge.
Harvey argues that this Court's recent opinion in Haliburton v. State, 514 So.2d 1088 (Fla. 1987), requires that his statements be suppressed. In that case, an attorney, contacted by Haliburton's sister on his behalf but without his knowledge, called the police near the end of Haliburton's polygraphic examination and requested that the questioning stop. The attorney subsequently arrived at the police station and asked to speak with Haliburton but was not allowed to do so. The attorney later obtained a telephone court order requiring the police to give him access to Haliburton, but they still refused. After the judge's second phone call, the police chief ordered that the interrogation cease, and the attorney was then able to see Haliburton. Haliburton successfully argued to this Court that the police conduct in his case was sufficiently egregious so as to violate his right to due process under article I, section 9 of the Florida Constitution. While we held that Haliburton's statement should have been suppressed, the facts of the instant case are much different and do not require suppression of Harvey's statement.
In Haliburton, the defendant's sister had called a specific attorney and asked him to represent her brother. The police refused to permit the attorney to see Haliburton even after a judge had ordered them to do so. Here, neither Harvey nor anyone from his family requested that an attorney come to the police station to talk with him. Rather, the public defender took it upon himself, after hearing of Harvey's arrest, to go to the station to see if Harvey needed a lawyer. Since the public defender was not Harvey's lawyer, the police had no duty to let the public defender talk to Harvey while he was making his statement to the police. Additionally, Harvey acknowledged his right to counsel prior to making his statement, and after being advised of these rights, he indicated that he would continue making his statement in the absence of counsel.
Harvey next argues that a potential juror was excused for cause from the panel while Harvey was not present and that he did not waive his right to be present at this crucial stage of his trial. During voir dire, it became apparent to the judge that one of the jurors was giving nonresponsive answers to the questions of counsel. The judge asked for the juror's father and both counsel to go into chambers to discuss the matter. After swearing in the father and questioning him, it was determined that the juror was unable to serve due to a mental infirmity. The state then moved to have the juror excused for cause, and Harvey's counsel stated that he did not oppose the motion. After excusing the juror for cause, the judge acknowledged that Harvey was not present but made the observation that he would have excused the prospective juror on his own motion had neither party made a motion.
Harvey relies on Francis v. State, 413 So.2d 1175 (Fla. 1982), in which a conviction was reversed because of the defendant's absence during jury selection. However, in *1086 Francis the emphasis was on the prejudice suffered by a defendant when he is deprived of his right to consult with counsel during the exercise of peremptory challenges. The court remarked:
The exercise of peremptory challenges has been held to be essential to the fairness of a trial by jury and has been described as one of the most important rights secured to a defendant. It is an arbitrary and capricious right which must be exercised freely to accomplish its purpose. It permits rejection for real or imagined partiality and is often exercised on the basis of sudden impressions and unaccountable prejudices based only on the bare looks and gestures of another or upon a juror's habits and associations.
Francis v. State, 413 So.2d at 1178-79 (citations omitted).
Here the challenge was for cause which involved a legal issue toward which Harvey would have had no basis for input. While the dictates of Florida Rule of Criminal Procedure 3.180(a)(4) were violated, Harvey's absence during this period of time amounted to no more than harmless error because Harvey obviously suffered no prejudice as a result. See Garcia v. State, 492 So.2d 360 (Fla.), cert. denied, 479 U.S. 1022, 107 S.Ct. 680, 93 L.Ed.2d 730 (1986).
Harvey's next point concerns the admission of evidence of his escape from jail a month before trial and the giving of a jury instruction on flight. The general rule on the admissibility of evidence of an escape as it relates to guilt is set forth in 2 S. Gard, Jones on Evidence § 13:47 (6th ed. 1987):
Whether escape by an accused in the face of accusation of crime is considered as an admission of guilt from conduct or merely as a circumstance from which a presumption or inference of guilt may be drawn, evidence of that fact is quite uniformly held to be admissible as relevant evidence of guilt of the crime charged.
This Court recognized the principle in Mackiewicz v. State, 114 So.2d 684 (Fla. 1959), cert. denied, 362 U.S. 965, 80 S.Ct. 883, 4 L.Ed.2d 879 (1960), when it said:
It is conceded by counsel for the appellant that the State was entitled to show that the appellant escaped from the Dade County jail, and rightly so, since it is well settled that evidence that a suspected person in any manner endeavors to escape or evade a threatened prosecution, by flight, concealment, resistance to lawful arrest, or other ex post facto indications of a desire to evade prosecution, is admissible against the accused, the relevance of such evidence being based on the consciousness of guilt inferred from such actions.
Id. at 689. Accord Washington v. State, 432 So.2d 44 (Fla. 1983). The state was therefore entitled to show that Harvey escaped from the Okeechobee County jail shortly before the commencement of his trial for first-degree murder. Since the evidence was properly admitted, the court did not abuse its discretion in giving a jury instruction on the subject.
Harvey also asserts that the court erred in refusing to grant his motion in limine to prohibit the state from suggesting to the jury that he would become eligible for parole after twenty-five years if a death sentence was not imposed upon him. When the prosecutor later made such a statement, Harvey made a motion for a mistrial which was denied.
Unquestionably, section 775.082, Florida Statutes (1983), provides that a person guilty of a capital felony who is not sentenced to death shall be punished by life imprisonment with the requirement to serve no less than twenty-five years before becoming eligible for parole. The premise for Harvey's argument is that chapter 83-131, Laws of Florida, repealed the provisions of law creating the Parole and Probation Commission effective on July 1, 1987. Thus, the argument goes that with the Commission dismantled there would be no procedure by which Harvey could obtain parole and the prosecutor's statement to the jury was therefore incorrect.
Harvey's position is devoid of merit. Section 775.082 constituted the applicable law at the time of his trial. Chapter 83-131 reflected an intent by the legislature to *1087 review the need for the Parole and Probation Commission in the wake of the enactment of the sentencing guidelines. Thus, section 35 of that law provided:
Section 35. Legislative committee review of the Parole and Probation Commission shall begin July 1, 1984, and shall include consideration of the following criteria:
(1) The role of parole release in the corrections system.
(2) The role of parole supervision in the corrections system.
(3) The relationship of parole release to the sentencing system.
(4) The cost to the state of eliminating parole release and other criminal justice mechanisms which could be adjusted to ameliorate this cost.
(5) Those functions performed by the Parole and Probation Commission which must be continued.

(6) The procedural and substantive effect of eliminating parole on the inmate population.
(Emphasis added.) It should be noted that first-degree murder is not a crime covered by the sentencing guidelines. § 921.001(4)(a), Fla. Stat. (1983). Any suggestion that Harvey would never become eligible for parole if sentenced to life imprisonment would have been sheer speculation. The prosecutor's argument accurately reflected the sentencing alternatives for those convicted of a capital felony, and therefore, there was no error in denying the motion in limine or the motion for mistrial.
Finally, Harvey attacks the imposition of the death penalty on the premise that there was insufficient evidence to support three of the four aggravating circumstances which were found by the trial judge.[4] Thus, he disputes the findings that the murders were (1) especially heinous, atrocious and cruel, (2) were committed for the purpose of avoiding lawful arrest, and (3) were committed in a cold, calculated and premeditated manner. In determining whether the circumstance of heinous, atrocious and cruel applies, the mind set or mental anguish of the victims is an important factor. Phillips v. State, 476 So.2d 194 (Fla. 1985). Both victims in this case were elderly persons who had been accosted in their home. They became aware of their impending deaths when Harvey and Stiteler discussed the necessity of disposing of witnesses. In desperation, the Boyds tried to run away, but Harvey shot both of them. When Harvey later came back into the house and realized that Mrs. Boyd was not yet dead, he fired his gun into her head at point blank range. See Hargrave v. State, 366 So.2d 1 (Fla. 1978), cert. denied, 444 U.S. 919, 100 S.Ct. 239, 62 L.Ed.2d 176 (1979). We find these facts sufficient to support a finding that both murders were especially heinous, atrocious and cruel.
We also find that the murders were committed for the purpose of avoiding lawful arrest. The test is whether the dominant motive behind the murders is to eliminate witnesses who can testify against the defendant. Floyd v. State, 497 So.2d 1211 (Fla. 1986). Both Harvey and Stiteler were known by their victims, and they discussed in the Boyds' presence the need to kill them to avoid being identified.
Finally, the facts support the finding that the murders were committed in an especially cold, calculated and premeditated manner. Rogers v. State, 511 So.2d 526, 533 (Fla. 1987). That Harvey and Stiteler planned the robbery in advance and even cut the phone lines before going over the bridge to the Boyd's home would not, standing alone, demonstrate a prearranged plan to kill. However, once the Boyds were under their control, they openly discussed whether to kill the Boyds. These murders were undertaken only after the reflection and calculation which is contemplated by this statutory aggravating circumstance. See Rogers v. State, 511 So.2d 526, 533 (Fla. 1987), cert. denied, ___ U.S. ___, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). We hold that the trial judge did not *1088 err by concluding that there were insufficient mitigating circumstances to outweigh the aggravating circumstances.[5]
Harvey's two convictions for first-degree murder and the two sentences of death are hereby affirmed.
It is so ordered.
McDONALD, C.J., and SHAW, GRIMES and KOGAN, JJ., concur.
EHRLICH, J., concurs in result as to penalty with an opinion, in which OVERTON and BARKETT, JJ., concur.
EHRLICH, Justice, concurring in result as to penalty.
I do not agree that the state has proved beyond a reasonable doubt that Harvey's actions in killing the Boyds were accomplished in an "especially ... calculated" manner. As the majority notes, Harvey and Stiteler discussed the necessity of disposing of witnesses during the course of the robbery. This apparently is the only plan or design he had to kill. This certainly supports the element of premeditation, but, in my view, does not measure up to the planning or prearranging design that the Court was articulating in Rogers v. State, 511 So.2d 526 (Fla. 1987). That Harvey administered the coup de grace to Mrs. Boyd when he came back in the house and observed that she was still alive is simply evidence of the fact that he wanted to finish what he had set out to do when he shot her. I do not believe Harvey's conduct in killing the Boyds measures up to the standard the Court set in Rogers to determine whether the state has met its burden of proof that the murders were "cold, calculated and premeditated" within the meaning of the statute.
OVERTON and BARKETT, JJ., concur.
NOTES
[1] It is unclear from the record what led to Harvey's ultimate arrest for the Boyds' murders during this traffic stop.
[2] The remaining six issues which we find to be without merit are (1) refusing to disclose the identity of a confidential informant; (2) excusing for cause three jurors who indicated they could not impose the death penalty under any circumstances; (3) prohibiting defense counsel from examining prospective jurors about the propriety of the death penalty; (4) an allegedly improper comment made by the state during voir dire; (5) denial of the motion to suppress Harvey's statement because it was allegedly made in exchange for a visit with his wife; and (6) refusing to give a special jury instruction.
[3] Apparently, it was the policy of the public defender's office to speak with all persons who had been arrested for felonies to determine if they wanted to retain an attorney, or if they could not afford one, to have one appointed.
[4] Harvey concedes the propriety of the finding that the murder was committed while he was engaged in the commission or the attempt to commit robbery or burglary.
[5] The judge found as a mitigating circumstance that Harvey had a low IQ and poor educational and social skills.