DAVIS, Chief Judge,
Concurring in part and dissenting in part.
I respectfully dissent from the majority’s opinion to the extent that it finds no error in the trial court’s denial of Mr. McAdams’ motion to suppress the incriminating statements he made to law enforcement prior to Miranda warnings being administered. However, I do concur with the majority’s conclusion that Mr. Mc-Adams’ convictions and sentences must be reversed because the trial court erred in denying Mr. McAdams’ motion to suppress evidence obtained by police after Miranda warnings were given but prior to detec-fives informing him that an attorney retained to represent him had come to the sheriffs office to speak with him. I also concur with the majority’s conclusion that the trial court did not err in denying Mr. McAdams’ motion to suppress physical evidence found in Mrs. McAdams’ home. Finally, I concur with the certification of the question of great public importance regarding the applicability of Haliburton v. State, 514 So.2d 1088 (Fla.1987) (Haliburton II).
With respect to Mr. McAdams’ pre-Mi-randa confession, I believe that the record is clear that Mr. McAdams was in custody when he made these statements and that, as such, the trial court should have suppressed those statements.
Mr. McAdams was tried for the premeditated murder of his estranged wife, Lynda McAdams, and her friend, Ryan Andrews. Mrs. McAdams and Mr. Andrews were first noticed to be missing when they failed to report to work on Monday, October 19, 2009. The Pasco County Sheriffs Office began its investigation of the missing persons on Wednesday, October 21, 2009, by visiting the McAdams’ residence on Palimi-no Road in Dade City.[2] On the morning of Friday, October 23, 2009, upon the request of the Pasco County Sheriffs Office, deputies from the Hernando County Sheriffs Office encountered Mr. McAdams at his new residence on Glover Road in Hernan-do County. They advised Mr. McAdams that Pasco County detectives wanted to talk with him as a part of their investigation into the disappearance of his wife and her friend. Mr. McAdams voluntarily accompanied the detectives to the Hernando County Sheriffs Office, where he waited for the arrival of two detectives from Pas- *409 co County. Mr. McAdams’ interview with the Pasco County detectives, one male and one female,[3] lasted nearly three hours, during which time he ultimately confessed to killing Mrs. McAdams and Mr. Andrews.
At trial, a video of Mr. McAdams’ statement was played for the jury. A Florida Department of Law Enforcement expert also testified that a blood stain on Mr. McAdams’ shirt contained human DNA that matched the DNA of Mrs. McAdams and that a blood stain on Mr. McAdams’ shorts contained DNA that matched the DNA of Mr. Andrews. Further testimony showed that these two items of clothing were found in Mr. McAdams’ Hernando County residence.
Prior to.trial, Mr. McAdams sought to suppress his confession and the evidence discovered as a result of that confession, i.e., the victims’ bodies. At the suppression hearing, Mr. McAdams first argued that suppression was warranted because during his interrogation an attorney hired by his parents to represent him had arrived at the sheriffs office requesting to see him. The attorney, Douglas Eden-field, was turned away, and Mr. McAdams was not informed of his presence until after Mr. McAdams had confessed and led detectives to the victims’ bodies. Counsel for Mr. McAdams argued that pursuant to the Florida Supreme Court’s decision in Haliburton II, 514 So.2d 1088, the police conduct of concealing from Mr. McAdams the fact that an attorney retained to represent him had been present and had requested to see him was a violation of the due process rights guaranteed Mr. Mc-Adams under article 1, section 9 of the Florida Constitution. '
The State acknowledged that Halibur-ton II was applicable if Mr. McAdams was in custody.[4] However, the State maintained that Mr. McAdams was not in custody.
Mr. McAdams’ counsel disagreed that Haliburton II only applied to one who was in custody. Nevertheless, he maintained that Mr. McAdams was in fact in custody at the time or soon after Mr. Edenfield arrived at the station. Specifically, he argued that although the interview began as a voluntary conversation, once the detective began to confront Mr. McAdams with the evidence of his guilt, the interrogation turned from voluntary to custodial. Counsel argued that the detectives’ failure to advise Mr. McAdams that Mr. Edenfield was attempting to communicate with him and their refusal to allow Mr. Edenfield access to Mr. McAdams was a violation of Mr. McAdams’ constitutional rights requiring the suppression of the statement. Counsel further argued that pursuant to the “fruit of the poisonous tree” doctrine, any evidence discovered based on the illegally obtained statement must also be suppressed.
Additionally, Mr. McAdams’ counsel argued that without even reaching a decision on the applicability of Haliburton II, suppression should be granted because Mr. McAdams was in custody when he gave his statement and was not given the warnings required by Miranda. I agree.
Mr. McAdams was in custody when he made his incriminating statements, and therefore the detectives violated his Miranda rights. Furthermore, by failing to *410 inform Mr. McAdams that a lawyer retained to represent him had been present at the sheriffs office and had requested to speak to him, the police violated Mr. Mc-Adams’ due process rights under the Florida Constitution. Accordingly, I believe that the trial court erred in failing to suppress Mr. McAdams’ confession.
Miranda Violation
In determining whether a suspect is in custody, “the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.” This inquiry is approached from the perspective of how a reasonable person would have perceived the situation.
Roman v. State, 475 So.2d 1228, 1231 (Fla. 1985) (citation omitted) (quoting California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983)) (some internal quotation marks omitted). In other words, the question is whether a reasonable person would believe that he was free to leave.
Roman provides several factors to consider in making such a determination, including whether a person was told he was free to leave or was under arrest. Id. Additionally, “the length of time of the interrogation, in some cases ... might make a difference.” Id. Likewise, the location of the interrogation may impact the custody determination, although “it does not have to be found that the environment in which [a suspect] was questioned was devoid of coercion” in order to make a finding that the suspect was not in custody. Id. at 1232.
In the instant case, Mr. McAdams was not told that he was under arrest, but he also was not told that he was free to leave. The interview lasted nearly three hours, but this was not unreasonable considering the nature of the investigation, and Mr. McAdams was allowed to take a break. Finally, beyond the fact that the interrogation took place at the sheriffs office, there was nothing so coercive about the location that a reasonable person would have believed he was being detained. As such, the answers to the Roman questions seem inconclusive to the question of custody in this case.
However, subsequent to Roman, the Florida Supreme Court drew a clearer picture of how to determine when one is in custody in Ramirez, 739 So.2d at 574. There, the court set forth a four-prong test that “provides guidance in making the determination whether a reasonable person in the suspect’s position would consider himself in custody.” Id. Under that test, the court should consider
(1) the manner in which police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; (4) whether the suspect is informed that he or she is free to leave the place of questioning.
Id. (citing State v. Countryman, 572 N.W.2d 553, 558 (Iowa 1997)).
Applying this test to the facts of the instant case indicates that Mr. McAdams’ questioning did not begin as a custodial interrogation. With regard to the manner in which Mr. McAdams was summoned to questioning, he was asked to meet the deputies at the sheriffs office and agreed to do so. The deputies offered him a ride, which he accepted. He was not arrested or in custodial detention at that time. As to the purpose, place, and manner of the questioning, Mr. McAdams was questioned in an interrogation room at the Hernando County Sheriffs office. Nothing about the room itself suggested that Mr. McAdams was in custody, and Mr. McAdams was positioned next to the door with the detec *411 tives beginning the interview seated at a reasonable distance for normal conversation. Initially, the questioning was conversational and factual, and during the first part of the interview, Mr. McAdams was not confronted with any evidence, nor was he told that he could or could not leave. In fact, at one point, the detectives took a break and Mr. McAdams was allowed to go down the hall to use the restroom.[5] Based on these facts, I would agree that during the first two hours of the interview, Mr. McAdams was not in custody.[6]
However, at roughly two hours and five minutes into the interview, the nature of the meeting changed dramatically. The video shows that the male detective left the interview room at 2:03 p.m. and returned at 2:04 p.m. He then asked the female detective to leave the room so that Mr. McAdams and he could be alone. Following the female detective’s exit, the male detective moved in closer to Mr. McAdams and began to talk to him about the effect a long investigation would have on his parents. The male detective then stated that he had been to Mr. McAdams’ home in Hernando County and to Mrs. McAdams’ residence in Pasco County. He advised that “the evidence ... is really, really strong” and that detectives found “tons of blood evidence and DNA evidence,” including blood on shorts and a t-shirt belonging to Mr. McAdams. The male detective stated, “I’ve already got a pretty dang good idea of what went down.” When Mr. McAdams protested that the blood on his clothing was rat blood from feeding his snakes, the male detective retorted that the blood had been tested and was determined to be human blood with DNA. He told Mr. McAdams, “This isn’t gonna go away.” He urged Mr. McAdams to tell him what happened. When Mr. McAdams was not forthcoming, the male detective reiterated, “I was at your house until, I think, 3:30 this morning. It’s all there, and it won’t go away.” Mr. McAdams responded that he needed a couple of days to think about things, but the male detective advised, “Regretfully, everything is already set in motion.”
Mr. McAdams asked, “Am I gonna be able to leave here today?” The male detective responded, “I don’t know, Mike. I don’t know.” Mr. McAdams then suggested that possibly his wife’s friend could have killed her. He then began to open up, stating that “[w]hatever happened out there Sunday, I was drunk.” When Mr. McAdams did not immediately continue with details, the male detective asked, “What are your intentions, Mike?” Mr. McAdams responded that he hoped his wife would come home, to which the male detective responded, “We both know that’s not the case.” Mr. McAdams asked, “How do you know that?” The male detective answered, “From all that evidence.” Mr. McAdams asked for another drink, and the male detective left the room for two minutes. Once the male detective returned, Mr. McAdams asked him, ‘What happens now?” The male detective responded, “You and I, we talk it out.” After a minute or two more, at 2:27 p.m., Mr. Mc- *412 Adams began to make his incriminating statement, detailing the shooting of the victims and ultimately drawing a map to show where he buried their bodies.
Viewing these facts with regard to the four-prong Ramirez test, I conclude that when the male detective returned to the room at 2:04 p.m., the nature of the questioning changed so that a reasonable person would have concluded that he was no longer free to leave and was now being held in custody. First, with regard to the third-prong of the test — “the extent to which the suspect is confronted with evidence of his or her guilt,” — the male detective told Mr. McAdams that the evidence against him was “really, really, strong,” that detectives had gathered “tons of blood evidence and DNA evidence,” that “[t]his isn’t going away,” and that he knew that Mrs. McAdams was not going to return home based on “all that evidence.” With regard to the second-prong of Ramirez— “the purpose, place, and manner of the interrogation” — the male detective informed Mr. McAdams that he had a pretty good idea of what happened, and the purpose of the interrogation changed to “[y]ou and I, we talk it out.” Additionally, the manner of the interrogation changed from an easy conversation to the male detective pulling his chair right up to Mr. McAdams so that they sat in close proximity to one another, necessarily intensifying the exchange. Finally, considering prong four of the Ramirez test — “whether the suspect is informed that he or she is free to leave the place of questioning” — when Mr. Mc-Adams asked for a couple of days to think things out, the male detective indicated that “everything was already set in motion.” Mr. McAdams then directly asked the male detective, “Am I gonna be able to leave here today?” The detective equivocated, answering, “I don’t know, Mike.” While this may not be a clear indication that Mr. McAdams was not free to leave, only a few minutes later Mr. McAdams asked, “What happens now?” The male detective responded, “You and I, we talk this out,” indicating that Mr. McAdams was not free to leave but rather had to stay there and talk to the detective. All of this occurred between 2:05 and 2:27 p.m.; however, Miranda warnings were not administered until 2:42 p.m.
Considering the totality of the circumstances that occurred after the female detective left the room, as Pitts, 936 So.2d at 1124, directs, I must conclude that a reasonable person in Mr. McAdams’ position would not have felt free to terminate the interrogation and leave but rather would have understood himself to be in custody. See also Rigterink, 2 So.3d at 246; Kessler v. State, 991 So.2d 1015, 1020 (Fla. 4th DCA 2008) (“Interrogation takes place for Miranda purposes ‘when a person is subjected to express questions, or other words or actions, by a state agent that a reasonable person would conclude are designed to lead to an incriminating response.’” (quoting Traylor v. State, 596 So.2d 957, 966 n. 17 (Fla.1992))).
Because Mr. McAdams was held in custody and interrogated without the benefit of being informed of his Miranda rights, I believe his confession should have been suppressed.
Due Process as Guaranteed by the Florida Constitution
Furthermore, pursuant to Haliburton II, the due process rights guaranteed to Mr. McAdams under the Florida Constitution were violated when his attorney was denied access to see him. The facts regarding Mr. Edenfield’s presence at the Hernando County Sheriffs Office prior to Mr. McAdams making his incriminating statement are not in dispute. Mr. Eden-field arrived at the Hernando County Sheriffs Office at around 2:00 p.m. He *413 advised the deputy at the front desk that he was an attorney and had been retained by Mr. McAdams’ parents to represent Mr. McAdams.[7] Mr. Edenfield testified that the deputy at the front desk walked back into an area behind a closed door and then returned and advised him that his client was in the major crimes area of the office and that he therefore could not see him. Mr. Edenfield then asked if he could get any communication to his client by telephone, email, or even a “note under the door,” but the deputy advised him that such was not possible. Mr. Edenfield then presented his Florida Bar card and asked that his presence be registered and the time be noted, but the deputy refused the request. Mr. Edenfield then asked the deputy to advise the detectives that he was requesting that any and all questioning be terminated until he could speak with his client. He then returned to his office and prepared a letter making the same request and faxed it to the sheriffs office.
At the suppression hearing, both detectives acknowledged that they knew an attorney was present at the sheriffs office and that he was asking to see Mr. Mc-Adams before Mr. McAdams made his incriminating statements. They also acknowledged that they made the conscious decision to deny the attorney access to his client and to delay advising Mr. McAdams that his attorney was trying to communicate with him. The female detective testified that it was her understanding that there was no need to advise Mr. McAdams of the attorney’s presence because when she learned that the attorney was outside, Mr. McAdams was not in custody as he had not made any incriminating statements.[8] The male detective testified that when he reentered the room and began confronting Mr. McAdams with the evidence of his guilt, it was his understanding that the attorney already had left and that therefore he need not advise Mr. Mc-Adams of the attorney’s attempt to see him.
Mr. Edenfield testified that he arrived at the station at 2:04 p.m.[9] The video timer indicates that the male detective— who candidly admitted he knew of the attorney’s presence when he resumed his discussions with Mr. McAdams — reentered the room at 2:05 p.m., asked the female detective to leave him alone with Mr. Mc-Adams, and then began to confront Mr. McAdams with the blood evidence. As such, the detective clearly began to seek the details of Mr. McAdams’ involvement without advising Mr. McAdams that his attorney was attempting to communicate with him.
Although the detectives advised Mr. Mc-Adams of his right to an attorney when they administered Miranda warnings at *414 2:42 p.m., they did not tell him that Mr. Edenfield attempted to contact him by coming to the sheriffs office. Following his statement, Mr. McAdams went with the detectives to Pasco County and showed them where the bodies were buried, following which the detectives and Mr. Mc-Adams returned to Mr. McAdams’ home in Hernando County. It was while they were at the home that Mr. McAdams was first told that his attorney had tried to communicate with him.

Haliburton I

These facts are similar to the facts of the Haliburton cases. See Haliburton v. State, 476 So.2d 192 (Fla.1985) (Haliburton I). Mr. Haliburton was taken to the police station at 6:30 a.m. for questioning regarding a residential burglary and murder. He was advised of his Miranda rights and questioned until 9:30 a.m. He was later questioned again and submitted to a polygraph exam. His sister arranged for an attorney to represent him. The attorney called the .police station and requested that the questioning be stopped. The attorney arrived at the station at about 4:00 p.m. and asked to speak with his client. Police officials denied this request. From 3:56 p.m. until about 4:20 p.m., Mr. Haliburton gave a statement admitting that he broke into the residence and saw the victim’s body but denying that he killed the victim.
Upon being denied access to his client, the attorney contacted a judge, and at 4:18 p.m., police officials received a telephonic court order requiring the police to allow the attorney access to his client. However, it was not until a second telephonic court order was received that police officials allowed the attorney to see Mr. Hali-burton. At the subsequent jury trial, the taped statement was played, and Mr. Hali-burton was convicted of burglary and first-degree murder.
On review, the Florida Supreme Court concluded that the police officials’ denial of the attorney’s request to speak with Mr. Haliburton invalidated the voluntary nature of Mr. Haliburton’s waiver of his Fifth Amendment rights. “In order for the right to counsel to be meaningful, a defendant must be told when an attorney who has been retained on his behalf is trying to advise him.” Id. at 194. The fact that the attorney had been retained by family without the suspect’s knowledge did not invalidate the ruling. Id. “Our holding turns on. the fact that the attorney retained by appellant’s sister on his behalf was in the station requesting to speak with appellant. The failure of the police to convey this information to appellant violated his otherwise valid waiver.” Id.
However, the State sought certiorari review by the United States Supreme Court, which vacated the Florida Supreme Court’s opinion, remanding the case “for further reconsideration in light of Moran v. Burbine, 475 U.S. 412,106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).” See Florida v. Haliburton, 475 U.S. 1078, 1078, 106 S.Ct. 1452, 89 L.Ed.2d 711 (1986) (parallel citations omitted).

Moran v. Burbine

In Burbine, 475 U.S. 412,106 S.Ct. 1135, the defendant was suspected of committing a burglary in Cranston, Rhode Island. He was arrested and taken into custody. That same evening, without the defendant’s knowledge, his sister contacted the public defender’s office to obtain legal counsel for him for the burglary charge. After the defendant was taken into custody, officials determined that he might have information or involvement in a murder that had taken place in Providence, Rhode Island, earlier that year. The sister and the public defender were unaware of the murder case.
*415 An assistant public defender telephoned the police department to advise that she would act as counsel for the defendant if the officials intended to question him that evening. She was informed by the police official that the defendant would not be questioned until the next morning. The attorney, however, was not informed that the defendant was also to be questioned concerning the murder case. Less than an hour after the telephone call, without informing the attorney of the change in plans and without informing the defendant that the attorney had made inquiry, the police questioned the defendant in a series of interviews. At the outset of each interview, the defendant was advised of his Miranda rights, and each time, he waived the same verbally and in writing. During all of these interviews, the defendant was unaware of his sister’s obtaining counsel for him, and at no time did he request the assistance of counsel. The statements the defendant gave during these interviews were used at trial, and Burbine was convicted of the murder charge in Providence, Rhode Island. The Rhode Island Supreme Court affirmed his conviction, rejecting his contention that the police had violated his Fifth and Fourteenth Amendment rights by failing to allow his attorney to have access to him. State v. Burbine, 451 A.2d 22, 31 (R.I.1982).
The United States Supreme Court determined that the defendant validly waived his right to the presence of counsel. 475 U.S. at 421, 106 S.Ct. 1135.[10] Furthermore, the Court observed that “[ejvents occurring outside the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right.” Id. at 422, 106 S.Ct. 1135. The Court then concluded:
Once it is determined that a suspect’s decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State’s intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.
Id. at 422-23,106 S.Ct. 1135. Accordingly, the Court determined that the failure to allow the attorney access to the individual did not render the statement involuntary or violate the individual’s Miranda rights.
The Court went on to conclude that the denial of access also did not deprive the individual of the fundamental fairness guaranteed him by the Due Process Clause of the Fourteenth Amendment of the United States Constitution: “[0]n these facts, the challenged conduct falls short of the kind of misbehavior that so shocks the sensibilities of civilized society as to warrant federal intrusion into the criminal processes of the States.” Id. at 433-34, 106 S.Ct. 1135. However, the Court specifically stated that “[njothing we say today disables the States from adopting different requirements for the conduct of its employees and officials as a matter of state law.” Id. at 428, 106 S.Ct. 1135.

Haliburton II

On remand, the Florida Supreme Court in Haliburton II, 514 So.2d at 1090, noted this portion of the Burbine opinion and reaffirmed its original opinion reversing *416 Mr. Haliburton’s conviction because the police conduct violated the due process rights guaranteed him by article 1, section 9 of the Florida Constitution.
[D]ue process requires fairness, integrity, and honor in the operation of the criminal justice system, and in its treatment of the citizen’s cardinal constitutional protections-[Pjolice interference in the attorney-client relationship is the type of governmental misconduct on a matter of central importance to the administration of justice that the Due Process Clause prohibits .... Just as the government cannot conceal from a suspect material and exculpatory evidence, so too the government cannot conceal from a suspect the material fact of his attorney’s communication.
Haliburton II, 514 So.2d at 1090 (second alteration in original) (quoting Burbine, 106 S.Ct. at 1165-66 (Stevens, J., dissenting)).
The State attempts to distinguish the facts of Haliburton II by pointing out that in that case the police not only denied the attorney access to his client but continued to do so in the face of a telephonic court order to the contrary. See id. Although the Haliburton II court did note the police’s refusal to comply with the court’s telephonic order, it did so only after first stating the following:
[Tjhe attorney in the instant case not only telephoned the police station as to the status of his client, but subsequently arrived at the station and requested access. ... “[T]o pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an indentified attorney actually available to provide at least initial assistance and advice, whatever might be arranged in the long run.”
Id. (quoting State v. Haynes, 288 Or. 59, 602 P.2d 272, 278 (1979)). As such, I conclude that the conduct found to be improper in Haliburton II was the failure to allow the attorney access, not the failure to obey the telephonic order. Accordingly, I would read Haliburton II to establish a bright line in Florida that the failure by law enforcement officials to advise a suspect that his attorney is attempting to contact him and to refuse an attorney who is present access to his client violates the guarantee of due process provided for in article I, section 9 of the Florida Constitution.

Smith v. State

The State here also relies on Smith v. State, 699 So.2d 629 (Fla.1997), for the proposition that the police were not required to inform Mr. McAdams of Mr. Edenfield’s presence at the sheriffs office. Smith, however, is factually distinguishable from the instant case. In that case, Mr. Smith was under indictment for first-degree murder and several other offenses. An arraignment was held for codefendants who were in custody at a time when Mr. Smith was not. Mr. Smith was not present at the hearing, but an assistant public defender who previously had represented Mr. Smith on an unrelated matter volunteered to appear on behalf of Mr. Smith. She noted the conflict her office had in providing representation for Mr. Smith in the murder charge, and the trial court appointed private counsel to represent Mr. Smith if and when he was taken into custody. This appointed attorney filed a written plea of not guilty and a demand for discovery prior to his having contact with Mr. Smith and prior to Mr. Smith being taken into custody.
It was almost a month later before Mr. Smith was arrested. At that time, he was given Miranda warnings, waived his rights, and submitted to questioning. The day after his arrest, he was again ques *417 tioned and again waived his Miranda rights. During this questioning, he confessed. Mr. Smith later challenged the admissibility of the confession, arguing that the failure to advise him of the appointment of his attorney invalidated the waiver of his Miranda rights, violated his right to counsel as guaranteed by the Sixth Amendment, and violated the due process rights guaranteed him under the Florida Constitution. The Florida Supreme Court rejected these arguments. On the due process issue, the court made the specific finding that because there had been no prior finding of Mr. Smith’s indigence, the trial court’s appointment of counsel was an “unauthorized by section 27.52, Florida Statutes (1989), and was thus a nullity.” Id. at 639. The court concluded that Hali-burton II did not control the decision:
We distinguish Haliburton on two bases. First, Haliburton did not confront the question of waiver under the Sixth Amendment. Second, we find the offensive police misconduct which compelled the decision in Haliburton was not present in this case. Rather, we find this case similar to Harvey v. State, 529 So.2d 1083,1085 (Fla.1988), in which we found no due process violation when police denied the public defender access to the defendant when the public defender voluntarily went to the jail after hearing about the defendant’s arrest to see if the defendant needed a lawyer.

Id.

Because Smith is factually distinguishable from Haliburton II on the basis that there was no valid attorney/client relationship, Smith is also distinguishable from the instant case. Here, Mr. Edenfield was retained by Mr. McAdams’ family, and the attorney/client relationship was established even though Mr. McAdams was not aware of his family’s actions. See Haliburton II, 514 So.2d at 1090 (“ ‘[Tjhere can be no constitutional distinction ... between a deceptive misstatement and the concealment by the police of the critical fact that an attorney retained by the accused or his family has offered assistance, either by telephone or in person.” (emphasis added) (quoting Burbine, 475 U.S. at 453, 106 S.Ct. 1135 (Stevens, J. dissenting))).[11]
Accordingly, I conclude that based on Haliburton II, the trial court erred in denying the motion to suppress the statement in that the detectives’ failure to advise Mr. McAdams of his attorney’s efforts to contact him and to allow the attorney access to his client violated the due process rights guaranteed Mr. McAdams by article 1, section 9 of the Florida Constitution. See also State v. Allen, 548 So.2d 762 (Fla. 1st DCA 1989). I also conclude that Mr. McAdams’ interrogation became custodial for Miranda purposes when the detective began to confront him with the evidence as described above.
Therefore, I concur with the majority’s reversal of Mr. McAdams’ judgments and sentences based on the trial court’s erroneous denial of his motion to suppress evidence obtained post-Miranda but prior to his being informed that his attorney had been present. I also concur that the trial court did not err in denying the motion to suppress evidence found at Mrs. McAdams’ residence, and I concur with certifying the question of great public importance regarding the applicability of Haliburton II to the questioning of an *418 accused who is not in custody. However, I dissent with regard to the majority’s conclusion that the trial court did not err in denying Mr. McAdams’ motion to suppress the incriminating statements he made prior to the detectives advising him of his rights under Miranda.

. The residence was owned by Mr. and Mrs. McAdams as tenants by the entirety. Mr. McAdams had moved to Hernando County due to the marital difficulties the couple was experiencing. The property was in foreclosure, and Mrs. McAdams was to continue to reside there until the foreclosure sale was completed.

. This is noted only as a means of differentiating one detective from the other.

. The prosecutor stated, "So we look at the proposition that Haliburton applies if the defendant is in custody. And I have no quarrel with that, I think that is an accurate statement of the law.”

. Mr. McAdams argues on appeal that he was accompanied to the restroom by the two detectives and an additional deputy, thus showing that he was not free to leave. However, my review of the video of the interview supports the State’s argument that the Pasco County detectives who were doing the questioning did not know where the restrooms were in the Hernando County Sheriff’s Office and that the Hernando County deputy was showing Mr. McAdams and the two detectives where to find the restrooms.

. The video of Mr. McAdams’ interview indicates that he sat alone in' the interrogation room from 11:09 a.m. until the Pasco County detectives entered at 11:55 a.m. Actual questioning began just before noon.

.Mr. McAdams' parents contacted Mr. Eden-field's office and retained the firm to represent Mr. McAdams in conjunction with the investigation into the disappearances of Mrs. McAdams and Mr. Andrews. By this time, Mr. McAdams’ father already had informed police that Mr. McAdams had been asking about obtaining a gun from his father and had appeared to the father to be depressed. Although Mr. McAdams' father did not give the police any information that directly implicated Mr. McAdams in the disappearance, it did raise concern as to his involvement.

. At the suppression hearing, the female detective testified that at the time, she did not necessarily believe that Mr. McAdams was a suspect. The trial judge concluded that although she did not consider that testimony credible, the real issue was what a reasonable person in the suspect’s position would have believed under these circumstances, not the state of mind of the detective.

. We note that there is a time discrepancy between Mr. Edenfield’s testimony and the video timer. However, in light of the male detective’s testimony, the discrepancy is without significance.

. Procedurally, the Burbine case came before the United States Supreme Court on review of a petition for writ of habeas corpus originally filed in the United States District Court, District of Rhode island. See Burbine v. Moran, 589 F.Supp. 1245 (D.C.R.I.1984). After the First Circuit reversed the denial of the habeas petition, 753 F.2d 178 (1st. Cir. 1985), the United States Supreme Court granted certiorari, 471 U.S. 1098, 105 S.Ct. 2319, 85 L.Ed.2d 838 (1985).

. I would also note that the Smith court's description of the ruling in Haliburton II makes no reference to the telephonic court orders. As such, by the supreme court’s own interpretation, Haliburton II was not premised on the disregarding of the telephonic court orders as the dispositive conduct that resulted in a finding of a state due process violation.