## STATE OF FLORIDA v MARTIN

Case No. 66551-QD

County Court, Volusia County

June 21, 1988

### APPEARANCES OF COUNSEL

**Sam Easterbrook,** Assistant State Attorney for plaintiff.

**Flem K. Whited, III** for defendant.

### OPINION OF THE COURT

SHAWN L. BRIESE, County Judge.

THIS MATTER having come before the Court on May 24, 1988 on Defendants' Motions to Suppress statements and admissions and all evidence relating to a chemical test to determine blood alcohol content, and the Court having heard testimony therein, finds as follows:

Counsel stipulated to the Court's consideration of the depositions of the arresting officer and breath test operator along with law enforcement forms and reports in the court file in disposing of the motions. The arresting officer also offered brief testimony.

Port Orange Police Officer T. R. Brown testified that he advised the defendant of her *Miranda* rights and Florida's Implied Consent Law immediately after the on scene field sobriety tests. The defendant, according to Officer Brown, indicated she understood her rights and voluntarily waived them. The Alcohol Influence Report in the instant case was completed subsequent to the rights advice and waiver.

Officer Brown's deposition revealed the following:

Q — When did you start asking her the questions on the back, right after you finished the field sobriety test? I notice there's only a five minute difference in time.

A — No. That was about the time it took us to get to the station. Because I had her get in the car, sit in the back. I didn't handcuff her or anything until I advised her she was at fault in the accident, according to my investigation. And since she was by herself, and that I had, you know, suspected her of drinking, advised her of her implied consent and asked her if she would submit to a breath test.

Q — Is that all you told her?

A — And she agreed to. . . . (T 20-21)

\* \* \*

Q — Now, after you finished the field sobriety test, what did you do, what did you say, where did you go?

A — That's when I turned around and advised her of her implied consent and told her she was under arrest.

Q — Okay.

A — And she repeated the question. She said, "Am I getting a ticket?" And said said, "Am I under arrest?" And I said, "Yes ma'am."

Q — That's what you told her?

A — Basically, yeah.

Q — Anything else that you can recall, as best you can?

A — No right off the top of my head. I'm not referring to the report as a refresher, but basically after that, I had gotten her to get into the back of the car, close the door, and transported her to the station.

Q — You got her out of the car, go into the station. And evidently you pretty quickly go into somewhere and start asking the questions, then?

A — You mean the questions on the back of this thing?

A — Right, just looking at the time is the only reason I say fairly quickly. (T 23-24).

\* \* \*

Q — You got her in the station, you're at the booking desk. But before you did the field sobriety test, you told her what you were going to do? 'I'm going to give you a field sobriety test.' Did you do anything like that type thing when you went to the interview form with her?

A — Yeah. (T 26)

\* \* \*

Q — Okay. You asked her those questions?

A — And I explained to her what I was going to do.

Q — Okay.

A — Again I advised her, you do realize you're under arrest for DUI, suspicion of DUI, told her I was going to ask her some questions and that I had to fill out the SA 751 and the citations, and explained to her that I had to do that, and fingerprint and photograph her, and she had agreed to take the breathalyzer test. And I think it was Ronnie Wright who was the breathalyzer operator. And I said, this is the gentleman who's going to give you the test, and she relaxed a little bit.

Q — Okay.

A — Than I started asking — I said, would you like to answer the questions here. I said, I've got questions I have to fill out. I said, be honest, be candid; no problem. I read it right off the sheet.

Q — That's essentially it before you started asking the questions, and then you just go through the form?

**45**

A — Yeah. I went through the form, asked her the questions. And when we got through, again I asked her, 'Are you all right?' 'You're not feeling ill?' Because when somebody rolls a car like that, you know, at the scene maybe they're all right, maybe they're not; I don't know. But I wanted to be sure.

Q — She was cooperative with you. I guess?

A — Mm-hmm. She was very cooperative, no problem. A lot of questions, but no problem. (T 27-28)

It was evident from the deposition that Officer Brown's recollection of the incident was not totally clear as he did not have his report to refresh his collection as to specifics (See T 17, 24). Officer Brown's computer generated report completed by the word processor on October 21, 1987 indicates that after the field sobriety tests "Ms. Martin was then advised of implied consent and read her *Miranda* rights which she constantly kept interrupting with 'Am I getting a ticket?' And, 'Am I getting arrested?' "

Defense counsel never asked the specific question, "Did you ever advise her of her *Miranda* rights?" Likewise, the Assistant State Attorney evidently did not recognize the focus of the defense inquiry and ask the question himself.

The State's burden of proof in establishing that *Miranda* warnings were given, that they were adequate and that any waiver was knowing and intelligent is by clear and convincing evidence. This standard is less demanding than the exclusion of every reasonable doubt and requires more than a preponderance. *State v. Graham,* 240 So.2d 486 (Fla. 2d DCA 1970). See also *Roman v. State,* 475 So.2d 1228 (Fla. 1985) and *Finley v. State,* 378 So.2d 842 (Fla. 1st DCA 1979).

A resolution of the issue as to the voluntariness of a confession is a job for the trial court, whose province it is to adjudge the credibility of the witnesses and the weight of the evidence. Where the record demonstrates that the defendant was informed adequately and fully of his *Miranda* rights prior to interrogation and made a knowing and intelligent waiver of his right to counsel, it is not error for the trial court to deny a motion to suppress a confession so obtained. Before a confession may be admitted as evidence, the prosecution has the burden of demonstrating that the defendant has been advised of the full range of his constitutional rights, as established in *Miranda. Van Horn v. State,* 334 So.2d 43 (Fla. 3d DCA 1976). See the following cases in which the courts found that the state met its burden of proof despite conflicting testimony: *Van Horn, supra; Foreman v. State,* 213 So.2d

754 (Fla. 1st DCA 1968); and *Manuel v. State* 190 So.2d 1 (Fla. 1st DCA 1966).

This Court finds, in light of the officer's hearing testimony, the computer generated report of October 21, 1987, and the officer's deposition testimony given evidently absent a review of his reports that the State has met its burden of proof as to the advice of rights and to the voluntariness of any statements. Such very well may have not been the case, if, during deposition, the officer answered no to the direct question, "Did you ever advise her of her *Miranda* rights?"

This Court would also note that the defendant in paragraph eight of her Motion to Suppress—Statements and Admissions states, "Further subsequent to the defendant's arrest he [sic] was advised that he [sic] did have the right to remain silent . . ."

The defense's requested suppression of all evidence relating to a chemical test to determine blood alcohol content based on the alleged failure of the State to comply with the twenty minute pre-test waiting period pursuant to § 316.1932(1)(b)1 *Fla. Stat* (1987) is moot in light of this Court further holding in the instant case. See *infra.*

HRS Rule 10D-42.024(f) provides:

The technician, arresting officer, or person administering the collection of the breath sample *must make certain the subject* has not taken anything by mouth or *has not regurgitated* for at least twenty minutes before administering the test. . . . [Emphasis added]

The Webster's New Word Dictionary defines regurgitate as "to surge or flow back, or cause to do this; specifically, to bring (partly digested food) from the stomach back to the mouth." The obvious reason for the rule is to prevent any breath testing machine from recording any mouth alcohol as opposed to deep lung air so as to forestall a falsely high reading.

Officer Wright revealed the following in deposition with regard to the required twenty minute waiting period:

A — She was sitting on a bench in the jail section of the police department. I was sitting at the booking desk approximately 20 feet away from her. While she's sitting there waiting for the allotted time to lapse, I was writing her name and information on the breathalyzer intoxilyzer log, maintaining a visual gaze upon her to make sure that she doesn't ingest anything.

Q — What do you understand your function to be during this 20

**47**

minute period of time? What were you supposed to be doing? In your own mind, tell me.

A — Make sure that she doesn't smoke or drink anything.

Q — That's the sole purpose?

A — Yes.

Q — She didn't smoke or drink anything?

A — That's correct.

Q — Can you say with any degree of specificity whether she burped or regurgitated, or were you even paying attention for those things?

A — I was also paying attention for that, if I hear that; yes, sir.

Q — You didn't hear it, I assume?

A — No. (T 9-10)

\* \* \*

Q — Is it possible that during the period of time between — or between this 20 minute period of time — that she could have conceivably had inaudibly brought something from her stomach into her breath channel and you not know about it?

A — It's conceivable.

Q — We do that all the time when we don't want people to know we burped, I guess; right?

Mm-hmm.

Q — Is that a yes?

A — Yes.

Q — Did you ask her if it occurred?

A — No.

Q — Prior to the 20 minute period of observation, did you say to her, 'Miss Martin, we're in a very important period of time here, in this 20 minute period of time. I've got a few things to do. I can't watch you every second, but if you burp, regurgitate, please notify me.'

Did you say anything along those lines to her?

A — No, sir. All I told her was to have a seat on the bench, and don't move from the bench, for 20 minutes until we take the test. (T 10-11)

It is unclear how Officer Wright could "make certain" that the defendant had not regurgitated during the waiting period when he was sitting approximately twenty feet away from the defendant filling out the machine log. It also appears that Officer Wright was more concerned with ingestion rather than regurgitation. Officer Wright, while recognizing it was possible to silently regurgitate and bring residual alcohol into the mouth effecting the machine reading, did not even make an inquiry as to whether it occurred (T 11).

The State has failed to comply with HRS Rule 10D-42.024(f) and as such any breath test result and evidence related thereto are inadmissible. It is therefore;

ORDERED and ADJUDGED that Defendant's Motion to Suppress statement and admissions is denied. Defendant's Motion to Suppress all evidence relating to a chemical test to determine blood alcohol content is granted.

DONE and ORDERED in Chambers at Daytona Beach, Volusia County, Florida this 21st day of June, 1988.