699 So.2d 629 (1997)
Ronald SMITH, Appellant,
v.
STATE of Florida, Appellee.
No. 83485.
Supreme Court of Florida.
July 3, 1997.
Rehearing Denied September 15, 1997.
*633 Valerie Jonas, Specially Appointed Public Defender, Miami Beach; and Benjamin S. Waxman, Specially Appointed Public Defender of Robbins, Tunkey, Ross, Amsel, Raben & Waxman, P.A., Miami, for Appellant.
Robert A. Butterworth, Attorney General and Randall Sutton, Assistant Attorney General, Miami, for Appellee.
PER CURIAM.
We have on appeal the judgments and sentences of the trial court imposing the death penalty, five life sentences, and three thirty-year sentences to run consecutively upon Ronald Smith. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm the convictions. However, we reverse the sentence of death on the first-degree murder charge and remand for resentencing in front of a jury. This resentencing is to be held within 120 days of this opinion becoming final.
On February 5, 1991, Tawana Glass went to a bar with Cornell Austin to meet Ronald Smith and Kevin Nolden. After drinking beer and playing pool, the group, which now included Kelvin Bryant and Anthony Cobb, formed a plan whereby Glass would pose as a prostitute and the others would then rob anyone who tried to pick her up. When the plan failed, the group returned to the bar. Anthony Cobb had driven his car to the bar, and subsequently they all left the bar in his car.
The group drove past a motel parking lot, where they saw the victims, Trevor Munnings and Bridgette Gibbs. The group pulled into the hotel parking lot, pulled the victims to the ground, took their money, and threw them in the trunk of Munnings' car. Cobb, Bryant, and Glass drove in Cobb's car, and Smith, Austin, and Nolden followed in Munnings' car. They drove to a gas station to buy beer. The group then drove the two cars until Cobb's car stalled. Thereafter, the group all traveled in Munnings' car to Austin's house to get some tape with which to bind the victims.
Once at Austin's house, Glass went through Bridgette Gibbs' purse. Looking at the contents of the purse caused Glass to realize that she recognized Gibbs, who remained with Munnings in the trunk of Munnings' car. Glass told Austin she knew Gibbs and asked Austin not to hurt her. Glass remained at the house, and after Austin got some tape, the rest of the group drove off to find a location at which to tape the victims.
The group drove to a location near the house where Smith lived. Munnings was forcibly pulled out of the trunk and his extremities taped. The tape, however, was not strong enough to restrain Munnings, and he tried to crawl under the car. He was then pulled out from under the car and hit on the head with a rock. Munnings testified that he was only momentarily rendered unconscious but that he pretended to be unconscious for the remainder of the night. Munnings was *634 put back into the trunk with Gibbs. The group drove the car about a block, and Smith walked to his residence and retrieved some duct tape from his stepfather's toolbox.
The group then traveled a few blocks to a place where both victims were taken out of the trunk and bound with duct tape. Gibbs' hands were taped behind her back, and tape was used to cover her eyes, nose, mouth, and ears. Also, Gibbs' clothes were removed from the waist down, and Nolden testified that Smith sexually battered Gibbs by inserting a stick into her vagina. Gibbs' jeans shorts were later recovered under the abandoned house where the taping had been done. Munnings' hands were similarly taped behind his back, his feet taped together, and his face taped from his chin to his forehead. Next, the group drove to the top of a bridge crossing Biscayne Bay. Gibbs was taken out of the trunk, and while she was still bound, she was thrown into Biscayne Bay. Gibbs died from drowning. The group then drove to another bridge crossing a canal. Munnings was taken from the trunk, and while he was still bound, he was thrown into the water. However, Munnings was able to free himself, swim to shore, and walk to a convenience store, where he flagged down a police car.
The group retrieved a gas can from the trunk of Cobb's car and went to a gas station. They then drove Munnings' car to an empty lot, wiped the car down to eliminate any fingerprints, and set the car on fire. By this time, Cobb's car was again operable, and the group drove off in it. The group divided the remaining proceeds of the robbery (some had been used to buy beer and gas) and sought more victims to rob. When they were unable to find other victims, the group went to an International House of Pancakes and had breakfast.
Smith confessed at the time of his arrest on May 2, 1991, almost three months after the crimes. He was tried jointly with Austin and Bryant.[1] At the trial, Glass and Nolden testified for the State. Glass gave eyewitness testimony placing Smith at the motel and explaining that Smith actively participated in the robbery and kidnapping of the victims. She also stated that she believed Smith was the central organizer of the entire criminal episode.
Nolden also gave eyewitness testimony to Smith's participation in the crimes. He corroborated the testimony of Glass that Smith actively participated in the initial crimes. Nolden also testified that Smith taped Gibbs, sexually battered her with a stick, and was involved in throwing the victims off of the bridges.
Moreover, Smith's confession was introduced to the jury. Smith admitted participating in the initial crimes and retrieving duct tape from his stepfather's toolbox to bind the victims. Smith further admitted that he was on the bridges when the victims were thrown into the water.
Smith, Austin, and Bryant were convicted of all nine counts in the indictment.[2] A penalty phase hearing was conducted, during which the State presented evidence that Smith had previously been convicted of three robberies and one attempted robbery and had been sentenced to a term of twenty-five years for his last conviction. In mitigation, Smith presented evidence to show that he had two children, had been the manager of a fast food restaurant, and had been a Boy Scout. At the close of the evidence, the jury recommended death for Smith by vote of nine to three and recommended life sentences for the other codefendants. Finding five aggravators,[3] no statutory mitigators, *635 and several nonstatutory mitigators,[4] the trial court sentenced Smith to death for the first-degree murder conviction.[5] The trial court also followed the jury's recommendation and sentenced the two codefendants to life sentences. The Third District Court of Appeal affirmed the codefendants' convictions and sentences, rejecting many of the issues Smith raises in this appeal. See Austin v. State, 679 So.2d 1197 (Fla. 3d DCA 1996), review denied, 689 So.2d 1068 (Fla. 1997).
On appeal, Smith raises sixteen issues: eight issues concerning the guilt phase[6] and eight issues concerning the penalty phase.[7] In his first two issues, Smith argues that the trial court erred in ruling on challenges for cause as to prospective jurors. In the first issue, Smith contends that the trial court erred in failing to grant three challenges for cause against prospective jurors who were biased in favor of believing the testimony of a law enforcement officer.[8] Since Smith was forced to exercise peremptory challenges to excuse these jurors, exhausted his peremptory challenges, and moved unsuccessfully to strike two identified jurors, he asserts that this case must be reversed.
The test for determining juror competency is whether the juror can lay aside any bias or prejudice and render a verdict solely on the evidence presented and the instructions on the law given by the court. See Lusk v. State, 446 So.2d 1038, 1041 (Fla. 1984). A juror must be excused for cause if any reasonable doubt exists as to whether the juror possesses an impartial state of mind. See Bryant v. State, 656 So.2d 426, 428 (Fla.1995). In reviewing a claim of error such as this, we have recognized that the trial court has a unique vantage point in the determination of juror bias. The trial court *636 is able to see the jurors' voir dire responses and make observations which simply cannot be discerned from an appellate record. Taylor v. State, 638 So.2d 30, 32 (Fla.1994). It is the trial court's duty to determine whether a challenge for cause is proper. Id. Since the carrying out of this duty poses a mixed question of law and fact, the trial court's determination will not be overturned in the absence of manifest error. See Mills v. State, 462 So.2d 1075, 1079 (Fla.1985).
As noted, Smith's claim involves prospective jurors' responses to questions concerning the jurors' predisposed beliefs about law enforcement officers. When it is anticipated that law enforcement officers may testify in a case, it is proper to ask prospective jurors about their assumptions concerning the testimony of law enforcement officers. See Chavez v. United States, 258 F.2d 816 (10th Cir.1958). While a defendant cannot be fairly tried by a juror who would give unqualified credence to a law enforcement officer's testimony simply because of his official status, Chavez, the relevant inquiry is whether the juror ultimately will consider the evidence presented and render an unbiased decision. Lusk; cf. Duncan v. State, 588 So.2d 50 (Fla. 3d DCA 1991) (in light of State's confession of error, finding error in failure to grant challenges for cause as to jurors who admitted bias in favor of credibility of police officers).
Based upon our review of the voir dire record concerning the three prospective jurors in question in this case and applying the relevant law, we conclude that the trial court ruled within the boundaries of its discretion. An analysis of the total questioning of the challenged jurors reveals that the trial court could find the jurors met the Lusk standard.
Similarly, we reject Smith's issue 2, whether the trial court erred in granting the State's cause challenge to juror Laitner. After initial questioning of this juror, the State sought to excuse this juror for cause, and Smith's counsel objected. The trial court then questioned the juror further. In response to a question from the trial court as to whether the juror's view of the death penalty would prevent or substantially impair his duties, juror Laitner stated:
I think if I weighed your instructions and there was still something in my belief that would not allow me to follow those, I would have no choice but to not follow those. Whether or not that happens, I don't know.
Following this response, the State again sought to remove the juror for cause. Smith did not object, and the trial court granted the challenge.
In order to raise this issue on appeal, a defendant must preserve the issue below with a contemporaneous objection. Peterka v. State, 640 So.2d 59, 65 (Fla.1994). Since Smith did not object to the excusal of this juror following the clarified responses, we find this issue procedurally barred. Id. However, if we did not hold that there was a procedural bar, we would conclude that the juror's response to the question shows that he would not meet the Lusk standard.
Next, we address Smith's issue 3: whether the trial court properly allowed the State to strike prospective juror Alston, an African-American. In response to the trial court's request for a race-neutral reason for exercising a peremptory challenge to this juror, the State submitted three reasons for the strike: (1) her occupation as a guidance counselor; (2) the possibility she would err on the side of life during the penalty phase; and (3) her reference to Oprah Winfrey. Defense counsel responded that the State relied solely upon defense counsel's questioning of Alston for the possible effects of her job on her ability to serve, and the State did not fully inquire into this subject. Additionally, defense counsel argued that Alston would be an impartial juror based upon her statements that she believed in the death penalty. Following a brief rebuttal from the State, the trial court allowed the challenge. On appeal, Smith claims that these reasons were either not race-neutral, not reasonable, or pretextual, and therefore the trial court committed reversible error in granting the strike. We disagree.
We recently clarified the guidelines concerning peremptory challenges. See Melbourne v. State, 679 So.2d 759 (Fla.1996). In Melbourne, we stated that upon proper objection *637 by the party opposing the other side's use of a peremptory challenge on racial grounds,[9] the court must ask the proponent of the strike to explain the reasons for the strike. Id. The burden of production then shifts to the proponent of the strike to offer a race-neutral reason for the strike. Id. If the explanation is facially race-neutral and the court believes in light of the circumstances surrounding the strike the explanation is not a pretext, then the strike will be sustained. Id. The court's focus is not on the reasonableness of the explanation but rather its genuineness, and the trial court's determination, which turns primarily on an assessment of credibility, will be affirmed on appeal unless clearly erroneous. Id. at 764-64. Applying these guidelines to the instant case, we affirm the trial court's decision. Accord Austin v. State, 679 So.2d 1197 (Fla. 3d DCA 1996).
In issue 4, Smith claims that the trial court's failure to provide him relief when he became ill violated his rights to due process, to be present at an essential stage of the trial, and to assist in his own defense. We have reviewed the record of the voir dire in this case, which lasted over ten days. We conclude that the trial court did not abuse its discretion under the circumstances in denying the request for continuance or other requested relief.
Turning to issue 5, Smith asserts that the trial court erred in failing to suppress the confession given by Smith when he was first taken into custody. Smith asserts that the confession was given after counsel was appointed for him, even though he did not know that counsel had been appointed. This claim has at its root the public defender voluntarily arranging to have counsel appointed for Smith before Smith was located and taken into custody. The record reflects Smith was not yet in custody on April 4, 1991, although an indictment on these charges had been filed against him. On April 4, an arraignment was held for the codefendants who were in custody.[10] During those proceedings, Connie Alter, a public defender who represented Smith on a different case, volunteered to appear on Smith's behalf. She noted that she had seen Smith's picture in the paper concerning this case and was concerned that Smith would need an attorney upon his arrest. Ms. Alter then noted conflict with the representation of Smith in the case in which the arraignments were being held. The presiding judge in that proceeding, without hearing from the State and without further comment, simply appointed private counsel, Bill Robinson, to represent Smith in this case. Robinson accepted the appointment the next day. Although Robinson did not have any contact with Smith until his arrest, prior to Smith's arrest Robinson entered a written plea of not guilty and a demand for discovery on Smith's behalf.[11] There was no demonstration of indigence as required by section 27.52, Florida Statutes (1989), for the presiding judge to have appointed counsel for Smith. Without such demonstration, the presiding judge had no authority to appoint counsel for Smith; and under the circumstances of this case, the appointment of counsel for Smith on April 4 was a nullity.
It was not until almost a month later, on May 2, 1991, that Smith was arrested in Tallahassee by officers from the Florida Department of Law Enforcement. At the time of his arrest, the officers notified Smith that he was being arrested for first-degree murder, attempted first-degree murder, robbery, two counts of kidnapping, burglary, arson, and second-degree conspiracy to commit a felony. Following his arrest, Smith was questioned by the arresting officers about the crimes. During this initial questioning by Agent Cornelius, Smith waived his Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. *638 1602, 16 L.Ed.2d 694 (1966), rights but denied participating in the crimes.
The next day, Smith was questioned by a Metro-Dade police officer, Agent Romangi. It was during this questioning that Smith again waived his Miranda rights and orally confessed. Romangi testified at the hearing on the motion to suppress that during this questioning, he did not notify Smith that Smith had already been indicted or that a court had appointed counsel for him because Romangi did not know about the indictment or appointment. The State later filed a superseding indictment against Smith and his codefendants, after which Smith waived a formal arraignment and again entered a plea of not guilty. Following a hearing on the motion to suppress the statement, the trial court denied the motion, finding that Smith never invoked the right to counsel, that he knowingly and voluntarily waived the right to counsel, and that his confessions were not the product of undue influence or trickery.
Smith claims that even though he waived his Miranda rights prior to interrogation, this waiver was ineffective because his right to counsel under both the Sixth Amendment and article I, section 16, Florida Constitution, had attached and had been invoked by the appointment of counsel. We agree with Smith that at the time of the questioning by police in Tallahassee, the right to counsel guaranteed Smith under both the Sixth Amendment and article I, section 16, had attached. However, we find competent, substantial evidence to support the trial court's conclusion that at that time: Smith had not invoked or asserted the right to counsel; Smith's subsequent waiver of the Miranda rights was effective; and Smith's statements were voluntary. Consequently, the trial court did not abuse its discretion in admitting these statements.[12] We reach this conclusion from the following analysis.
The Sixth Amendment to the United States Constitution provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." The stated purpose of the amendment's right to counsel is to protect unaided laymen at critical confrontations with the State. See United States v. Gouveia, 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984). The Sixth Amendment right to counsel attaches at the earliest of the following points: formal charge, preliminary hearing, indictment, information, or arraignment.[13]See Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).
Similarly, article I, section 16(a), of the Florida Constitution provides in pertinent part: "In all criminal prosecutions the accused shall, upon demand ... have the right ... to be heard in person, by counsel or both." The prime right embodied under this clause is the right to choose one's manner of representation against criminal charges, and this right encompasses two corresponding rights: the right to conduct one's own defense and the right to assistance of counsel. Traylor v. State, 596 So.2d 957, 968 (Fla. 1992). The right to counsel under article I, section 16, attaches at the earliest of the following points: when the accused is formally charged with a crime via the filing of an indictment or information; as soon as feasible after custodial restraint; or at first appearance. Phillips v. State, 612 So.2d 557, 559 (Fla.1992); Traylor. Since an indictment had already been filed against Smith prior to his arrest, it is clear that under both the federal and state constitutions the right to counsel attached when the indictment issued.
However, the fact that the right to counsel had attached is not alone enough to invoke constitutional protections of this right under the federal or state constitutions. Both require an accused to invoke the right to counsel to receive the protections. See, e.g., Phillips, 612 So.2d at 558 n. 2 ("Regardless of when the right attaches, the defendant *639 must still invoke the right in order to be protected."); Traylor; Owen v. State, 596 So.2d 985 (Fla.1992) (when right attaches and has been invoked, subsequent waiver of counsel of police-initiated questioning is invalid); see also Patterson v. Illinois, 487 U.S. 285, 290-91, 108 S.Ct. 2389, 2393-94, 101 L.Ed.2d 261 (1988) (rejecting claim that because the Sixth Amendment right to counsel attached, police were thereafter barred from initiating meeting with defendant where he did not retain or accept appointment attorney to represent him at time of questioning); Michigan v. Jackson, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) (once Sixth Amendment right to counsel has attached and been invoked by request for counsel at arraignment, waiver given during subsequent police-initiated interrogation is ineffective). Based on our review of the record, we affirm the trial court's finding that Smith did not make a specific request for an attorney or accept the appointment of counsel prior to executing the written waiver of rights.
A different result is not compelled by virtue of the fact that the public defender volunteered and thereafter counsel was appointed at counsel's request and began working on the case. The mere appointment of an attorney at the attorney's request is not enough to invoke the right; the accused must invoke the right. See Montoya v. Collins, 955 F.2d 279 (5th Cir.1992). Although Smith was represented by the public defender in another case, the right to counsel under either the Sixth Amendment or article I, section 16, is offense-specific. McNeil v. Wisconsin, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991); Traylor. Consequently, it does not follow by virtue of this earlier representation that Smith invoked the right to counsel or that Smith would necessarily accept the appointment of the public defender in this case. See United States v. Scarpa, 897 F.2d 63, 69 (2d Cir.1990) (under either Fifth or Sixth Amendment, attorney unknown to defendant may not invoke defendant's rights and thereby prevent defendant from asserting them); Perez v. State, 673 So.2d 160, 162 (Fla. 4th DCA 1996) (accused's mother could not invoke accused's Sixth Amendment rights; individual must assert right to counsel); cf. Moran v. Burbine, 475 U.S. 412, 422, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986) ("Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right."); Sapp v. State, 690 So.2d 581 (Fla.1997) (invocation of right to counsel under both Fifth Amendment and article I, section 9, made before interrogation was imminent, was ineffective to invoke right for subsequent interrogation). Our conclusion is bolstered by our finding that the court's order appointing counsel at the request of the public defender was unauthorized by section 27.52, Florida Statutes (1989), and was thus a nullity.
We further reject Smith's claim that our decision in Haliburton v. State, 514 So.2d 1088 (Fla.1987), requires a different result. In Haliburton, we held that the defendant's due process rights under article I, section 9 of the Florida Constitution were violated when: police denied an attorney, who was retained by the defendant's sister without the defendant's knowledge, access to the defendant; and police did not notify the defendant of the attorney's presence or request. Id. at 1090. We distinguish Haliburton on two bases. First, Haliburton did not confront the question of waiver under the Sixth Amendment. Second, we find that the offensive police misconduct which compelled the decision in Haliburton was not present in this case. Rather, we find this case similar to Harvey v. State, 529 So.2d 1083, 1085 (Fla.1988), in which we found no due process violation when police denied a public defender access to the defendant when the public defender voluntarily went to the jail after hearing about the defendant's arrest to see if the defendant needed a lawyer.
We recognize that an accused invokes the right to counsel by statements that indicate a desire to deal with police only through counsel. See Doyle v. State, 526 So.2d 909, 911 (Fla.1988). However, this objective inquiry requires the accused to make some positive statement or take other action that informs a reasonable person of the accused's desire. Cf. Davis v. United States, 512 U.S. 452, 460-62, 114 S.Ct. 2350, 2355-57, *640 129 L.Ed.2d 362 (1994) (after knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless suspect clearly requests attorney). On this basis, we distinguish Phillips v. State, 612 So.2d 557 (Fla.1992), in which the public defender was appointed to represent the defendant at a first appearance which was held after Phillips had been arrested and at which Phillips physically appeared. In that case, we held that the defendant's right to counsel had attached and was invoked. Id. at 559. This is in contrast to the events which occurred in this case, in which Smith did not appear when counsel was summarily appointed and did not invoke or accept the appointment of counsel.
This brings us to the question of whether Smith executed a valid waiver of his Miranda rights under the United States Constitution and the Florida Constitution. The issue here is similar to that addressed in Patterson v. Illinois, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988), in which the Court decided the question of whether interrogation of an accused after indictment violated the Sixth Amendment right to counsel. In Patterson, the right to counsel had attached, but the defendant had not retained or accepted by appointment a lawyer to represent him at the time of the questioning. Id., 487 U.S. at 290 n. 3, 108 S.Ct. at 2393 n. 3. Emphasizing the importance of asserting the right to counsel in finding a voluntary waiver of the right to counsel in postindictment questioning, the Court stated:
Had petitioner indicated he wanted the assistance of counsel, the authorities' interview with him would have stopped, and further questioning would have been forbidden (unless petitioner called for such a meeting). This was our holding in Michigan v. Jackson, supra,.... We observe that the analysis in Jackson is rendered wholly unnecessary if petitioner's position is correct: under petitioner's theory, the officers in Jackson would have been completely barred from approaching the accused in that case unless he called for them. Our decision in Jackson, however, turned on the fact that the accused "ha[d] asked for the help of a lawyer" in dealing with the police. Jackson, supra, 475 U.S. at 631, 633-35, 106 S.Ct., at 1409-1411.
Patterson, 487 U.S. at 291, 108 S.Ct. at 2394. The Court then found, as a general matter, that an accused who is admonished by Miranda warnings has been sufficiently apprised of the nature of the Sixth Amendment rights and the consequences of waiver so that waiver is knowing and intelligent for postindictment questioning. Id., 487 U.S. at 296-97, 108 S.Ct. at 2397.[14]
We find the same result is obtained under Florida law. In order for such a waiver to be valid in Florida, the waiver must pass muster under article I, section 16, and Florida Rule of Criminal Procedure 3.111(d). The rule provides in relevant part:
(2) A defendant shall not be deemed to have waived the assistance of counsel until the entire process of offering counsel has been completed and a thorough inquiry has been made into both the accused's comprehension of that offer and the accused's capacity to make an intelligent and understanding waiver.
Fla. R.Crim. P. 3.111(d)(2); see also Traylor.
In Traylor, at the time the accused was questioned by Florida police, he had already been charged by information with second-degree murder for a crime committed in Florida and charged with a separate murder committed in Alabama for which the defendant's request for appointment of counsel was granted. Id., 596 So.2d at 960. Florida officers questioned the accused, during which he waived his Miranda rights and confessed to both murders. Id. On appeal to this Court, we acknowledged that the article I, section 16, right to counsel was violated as to the questioning concerning the Alabama offense because the right to counsel not only *641 attached but was invoked by the request for counsel on that charge. Id., 596 So.2d at 972. However, we reached the opposite conclusion regarding the Florida offense. Id. While we noted that the defendant's right to counsel had attached on the Florida charge, we found significant the fact that the defendant had not retained or requested appointment of counsel for this charge. Id. In holding that the defendant validly waived his right to counsel under article I, section 16, and Florida Rule of Criminal Procedure 3.111(d) by waiving his Miranda warnings, we stated:
The clear language of this warning was sufficient for general Section 16 purposes. First, Traylor was adequately informed of his rights: He was expressly told that he had the right to have a lawyer's assistance prior to and during questioning and that if he could not afford a lawyer one would be appointed. This is the core of the Section 16 right to counsel. Second, he was sufficiently apprised of the consequences of his waiver: He was explicitly told that anything he said could be used against him in a criminal prosecution. This is the ultimate adverse consequence of a decision to submit to police questioning unassisted by counsel. Traylor's waiver of his Section 16 rights concerning the Florida crime was thus knowing and intelligent, and, as noted above, we agree with the court's finding that the statements were voluntary.
The waiver also complied with the specific requirements of rule 3.111(d). First, assistance of counsel clearly was offered to Traylor, and Detective Warren extensively inquired into Traylor's understanding of the offer. Second, the record contains no competent evidence showing that the waiver was the result of a deficiency in the defendant's mental condition, age, education, experience or any other factor. And third, the waiver was in writing, signed by two attesting witnesses. We thus conclude that Traylor's waiver of his Section 16 right to counsel was valid as to the Florida offense.
Traylor, 596 So.2d at 973 (footnotes omitted).
As earlier noted in this case, prior to questioning, the officers informed Smith of his Miranda rights, which included telling Smith that he had the right to remain silent; that anything he said could be introduced against him into evidence in court; that if he wanted a lawyer at that time or at any time thereafter, he was entitled to have one; and that if he could not afford one, a lawyer would be appointed at no cost. Smith initialed after each one of these rights; he acknowledged that he was willing to answer questions without having a lawyer present; and his signature on the waiver was witnessed by two officers. See Fla. R.Crim. P. 3.111(d)(4). The record shows that Smith told the officers that he had completed the eleventh grade and was not intoxicated. The officers provided Smith with food and drink. An officer described Smith as alert and attentive during the questioning, which lasted about three hours. We conclude that competent, substantial evidence supports the trial court's order finding that Smith did not invoke and validly waived his right to counsel in this case. Accordingly, we find this issue without merit.[15]
Next, we turn to issue 6: whether the trial court erred in failing to sever Smith's trial from his codefendants'. Smith moved for a severance on the basis that the introduction of statements by his nontestifying codefendants at a joint trial would violate his constitutional right to confront witnesses against him. After a hearing, the trial court denied the motion, finding that the statements could *642 be sufficiently redacted to present a complete version of the confession and to avoid any constitutional violations. The State then redacted the statements of Austin and Bryant by either eliminating references to Smith or substituting neutral pronouns for Smith. These statements were introduced through the testimony of the officers to whom the confessions were given. The redacted statements were read to the jury and copies of the redacted confessions were admitted into evidence.[16] The trial court instructed the jury several times during the trial that the jury was not to use these statements against Smith. On appeal, Smith contends that this redaction was insufficient because the jury would not be able to follow the instructions and would use these statements against him.
This is a variation of the issue addressed by the United States Supreme Court in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In Bruton, the Court was concerned about the effectiveness of a jury instruction in protecting a defendant's Sixth Amendment right to confrontation in joint trials in which a confessing codefendant is unavailable and that codefendant's unredacted, powerfully incriminating, extrajudicial confession expressly implicating the defendant is introduced as evidence only against the codefendant. The Court held that because of the substantial risk that the jury would disregard its instructions to use the confession only against the confessing codefendant and would use the confession in determining the defendant's guilt, the admission of the codefendant's confession violated the defendant's Confrontation Clause rights. Id., 391 U.S. at 126, 88 S.Ct. at 1622. The Court did not address the effectiveness of a limiting instruction in cases in which the codefendant's confession was redacted to delete reference to the implicated defendant. Id., 391 U.S. at 134 n. 10, 88 S.Ct. at 1626 n. 10.
Subsequently, the Court did address this question and held that when the codefendant's confession is redacted to eliminate any reference both to the defendant's name and to his or her existence, then a limiting instruction to the jury will sufficiently protect the defendant's Confrontation Clause rights. Richardson v. Marsh, 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987). In Marsh, the Court initially noted that in a joint trial, a witness whose testimony is offered only against a codefendant is not ordinarily considered a witness "against" the defendant. Id., 481 U.S. at 206-07, 107 S.Ct. at 1706-07. The Court then distinguished the narrow exception to this rule created in Bruton, stating:
In Bruton, the codefendant's confession "expressly implicat[ed]" the defendant as his accomplice. Id., at 124 n. 1, 88 S.Ct. at 1621, n. 1. Thus, at the time that confession was introduced there was not the slightest doubt that it would prove "powerfully incriminating." Id., at 135, 88 S.Ct. at 1627. By contrast, in this case the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony).
Marsh, 481 U.S. at 208, 107 S.Ct. at 1707. The Court reasoned that when a statement becomes incriminating when linked with other evidence introduced at trial, there is no overwhelming probability of the jury's inability to follow the instruction. Id. Further, the Court found the rule practical, because to hold otherwise and extend the Bruton rule to confessions incriminating by connection would force a trial court to predict what evidence would likely be introduced to determine the admissibility of the statements.[17] *643 Id., 481 U.S. at 209, 107 S.Ct. at 1708. However, the Court left open the question of whether redaction of only the defendant's name would be sufficient to protect the defendant's constitutional rights. Id., 481 U.S. at 211 n. 5, 107 S.Ct. at 1709 n. 5.
Even if the confessions are found to be sufficiently redacted to be admitted with a proper instruction, an additional issue arises: whether the prosecutor in argument nullified the effectiveness of the instruction by advocating to the jury that it use the confessions against Smith. Even though the Court in Marsh found the redaction coupled with the limiting instruction sufficient to overcome any Confrontation Clause concerns, the Court found error in the prosecutor's argument, which sought to undo the effectiveness of the limiting instruction by urging the jury to use the codefendant's confession in evaluating the defendant's case. Id. The court ultimately remanded the case for a determination of whether the absence of an objection to the prosecutor's argument would preclude the issuance of a writ of habeas corpus. Id.
Motions for severance in Florida are governed by Florida Rule of Criminal Procedure 3.152 as applied within these constitutional requirements. See Bryant v. State, 565 So.2d 1298 (Fla.1990). Pursuant to this rule, in cases in which a statement made by a nontestifying codefendant is to be introduced in a joint trial against the codefendant who made the statement but is either determined by the Court or conceded by the State to be inadmissible against the defendant who is moving to be severed, rule 3.152(b)(2) requires the State to elect one of three courses: (1) a joint trial at which evidence of the statement is not admitted; (2) a joint trial at which evidence of the statement is admitted after all references to the moving defendant have been deleted, provided the court determines that admission of the evidence with deletions will not prejudice the moving defendant; or (3) severance of the trial.
This rule is designed to ensure a fair determination of each defendant's guilt or innocence by enabling the presentation of evidence in such a manner that the jury can distinguish the evidence properly admitted against each defendant, follow the given instructions, and apply the law to determine the individual defendant's guilt or innocence. McCray v. State, 416 So.2d 804, 806 (Fla. 1982). The rule provides the trial court with discretion to grant a severance when a jury would be influenced by evidence which is admissible only against one defendant in determining the guilt of another defendant. See id.
We conclude that the confessions were not sufficiently redacted because the redacted confessions of Austin and Bryant contained statements which facially and powerfully incriminated the other two defendants, one of whom was Smith. There are several statements in both the confessions of Austin and Bryant which are not self-inculpatory but rather are incriminating to others. For instance, Bryant's confession, which was read to the jury and placed into evidence, included the following in its redacted form:
Q Do you know why they wanted to tape the people up?
A Yes. They wanted to kill them.
Then, the prosecutor argued that this statement was evidence that all three defendants had committed premeditated murder. In addition to basing his motion to sever on the admission of the codefendants' confessions, Smith objected to the prosecutor's use of Bryant's confession in argument this way; however, the trial court overruled the objection. The trial court erred in admitting this portion of Bryant's confession in the joint trial and in overruling the defendant's objection to the prosecutor's argument.
It is our conclusion that the redaction sufficient to fit within the rule of Marsh to overcome the rule of Bruton does not authorize the admission of non-self-inculpatory hearsay. A limiting instruction advising the jury to use a confessing defendant's non-self-inculpatory statement only against the confessing defendant is incapable of eliminating *644 any hearsay or Confrontation Clause violations to the other defendants because the confessing defendant's statement does not speak about the confessing defendant. Bryant's statement set forth above provides an example of this: instructing the jury that it could only use Bryant's statement that "they wanted to kill them" as evidence against Bryant cannot successfully protect the other codefendants' Confrontation Clause rights (including Smith's) because the statement itself does not implicate Bryant but rather facially incriminates the other defendants. The admission of this statement does not come within the Marsh limitation of Bruton. Rather, it falls squarely within Bruton, and its admission was in violation of rule 3.152(b)(2).
Having concluded that there was error in the admission of the codefendants's confessions, we move to the issue of whether the error was harmless. We recently did an exhaustive analysis of the introduction of confessions of codefendants in a joint trial in Franqui v. State, 699 So.2d 1312 (Fla.1997). Franqui involved a somewhat different but related issue to the one before the Court today. The codefendant's confessions in Franqui were not redacted and were admitted as substantive evidence against the defendant. The admission was predicated on the theory that no Confrontation Clause violation existed because the confessions of the defendant and codefendant sufficiently interlocked to render the codefendant's confession reliable. Id. Since the confessions were admitted substantively, no limiting instruction was given. Based upon Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), and Cruz v. New York, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987), we determined that reliance on interlocking facts in determining the confessions' admissibility was error. However, in performing a harmless error review, we concluded that Cruz and Wright authorized the use of the defendant's confession and other record facts to determine whether error in admitting the confessions was harmless. For the reasons set out in Franqui,[18] we conclude that a harmless error review is similarly appropriate in respect to the error in the admission of Smith's codefendants' confessions.
Based upon our harmless error review, we conclude that errors in the admission of the non-self-inculpatory portions of the confessions of Bryant and Austin were harmless beyond a reasonable doubt in the guilt phase of the trial. In this case, Smith was charged with first-degree premeditated or felony murder and with being a principal in the first degree in the commission of each crime charged. The State presented live, direct testimony showing beyond a reasonable doubt that Smith was guilty of first-degree felony murder and of being a principal in the first degree to felony murder. Glass testified that Smith actively participated in the robbery and kidnapping of the victims. Nolden also testified that at the hotel, Smith grabbed Gibbs and put her on the ground; that Smith then drove in Munnings' car; that later that evening Smith retrieved some duct tape from his house; and that Smith then taped Gibbs' head and face. Nolden testified that Smith told Nolden to stop on the first bridge and that Smith was involved in throwing Gibbs into the water. In addition, Nolden testified that Smith poured gasoline inside and outside of Munnings' car and that the car was thereafter burned.
Last, there was the direct evidence of Smith's guilt from his own confession. Smith admitted participating in the initial crimes and retrieving duct tape from his stepfather's toolbox to bind the victims. Smith further admitted that he was on the bridges when the victims were thrown into the water. *645 Again, based on this direct evidence of Smith's guilt of first-degree felony murder and of being a principal in the first degree to felony murder, we find that the errors in the admission of the codefendants' confessions and the denying of the objection to the prosecutor's use of a portion of the codefendants' confessions so as to implicate Smith were harmless beyond a reasonable doubt in the guilt phase of the trial.[19]State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
Next, we reject Smith's issue 7: whether the trial court abused its discretion in admitting evidence of Smith's uncharged sexual battery upon the female victim. Nolden testified at trial and gave direct evidence of the events surrounding the battery. He stated that after the female victim was removed from the trunk, Smith taped her face and mouth as she was shaking her head no. Nolden testified that the victim was then laid on her back on the ground, and Smith placed a stick into her vagina. This testimony was consistent with other evidence presented at the trial: the victim was found stripped of her pants, and her jeans shorts were recovered from under an abandoned house near where the second taping occurred. However, the medical examiner testified that there was no medical evidence of trauma to Gibbs' vagina.
Based upon our review of the record, we find this evidence of sexual battery was relevant as an inseparable part of the criminal episode at issue and not unduly prejudicial. See § 90.402, Fla. Stat. (1989); Griffin v. State, 639 So.2d 966, 968-69 (Fla.1994). Moreover, we do not find that the medical examiner's testimony changes the result. Clearly, there was a conflict in the evidence testified to by Nolden and the medical examiner's findings of no trauma to Gibbs' vagina. However, this conflict does not render this relevant evidence inadmissible. Id. at 970 (in proving its case, State is entitled to paint accurate picture of events surrounding crimes charged); see also Hunter v. State, 660 So.2d 244, 251 (Fla.1995), cert. denied, ___ U.S. ___, 116 S.Ct. 946, 133 L.Ed.2d 871 (1996). Accordingly, we find this issue meritless.
While not directly challenged by Smith, we find competent, substantial evidence to support the convictions. We affirm Smith's convictions on all counts in the indictment.
Turning to the penalty phase, we reverse the death sentence and remand for resentencing in front of a jury. We reach this decision based upon the cumulative impact of the prosecutor's use of the statements of both Austin and Bryant as evidence of aggravating circumstances to be found against Smith. Our reversal is only as to the death sentence, and we affirm the remaining sentences against Smith.
During the State's closing argument, the court granted Smith a continuing objection to the prosecutor's use of the redacted statements of the codefendants as evidence against Smith. Thereafter, the prosecutor argued, as he did in the guilt phase, that Bryant's statement that "they" wanted to kill the victims was evidence against each of the codefendants. The prosecutor returned to this argument when discussing the aggravating circumstance that the murder was committed to eliminate Gibbs as a witness, urging the jurors to use their common sense and use this statement against the codefendants. The trial court sustained Smith's objection to this argument. The prosecutor again used the codefendant's statements against Smith in arguing for the heinous, atrocious, or cruel aggravating circumstance. In arguing the applicability of this aggravator, the prosecutor posited that because Austin stated that Nolden did not like it when Gibbs was sexually battered, Smith must have liked it. Smith did not make a contemporaneous objection to this argument. Nevertheless, in light of the continuing objection given to Smith on this issue and the cumulative impact of the prosecutor's argument to urge the jury to use the codefendants' confessions against Smith, we find that this prosecutorial misconduct requires a reversal of the penalty phase on the first-degree murder conviction.
*646 While our remand moots the remainder of Smith's penalty phase issues, to facilitate the resentencing, we find the evidence of the sexual battery is relevant in the resentencing as evidence of the heinous, atrocious, or cruel aggravating circumstance. See § 921.141(1), Fla. Stat. (1989) (relevant evidence in sentencing phase includes evidence relating to aggravating circumstances in section 921.141(5)).
Accordingly, we affirm the convictions. However, we reverse the sentence of death on the first-degree murder charge and remand for resentencing in front of a jury. This resentencing is to be held within 120 days of this opinion becoming final.
It is so ordered.
OVERTON, GRIMES, HARDING and WELLS, JJ., concur.
SHAW, J., concurs in result only.
ANSTEAD, J., dissents.
NOTES
[1] Two defendants, Glass and Nolden, pled guilty in exchange for prison terms. Glass reached a plea agreement with the State and was sentenced to eighteen years in prison. Nolden also reached a plea agreement and was sentenced to life in prison with no possibility for parole for twenty-five years for first-degree murder and to other prison sentences to run concurrently with that sentence. Cobb filed a motion for severance, which the trial court granted.
[2] The three were charged with: first-degree murder; attempted first-degree murder; two counts of robbery; two counts of kidnapping; burglary; arson; and conspiracy to commit a felony.
[3] The trial court found the following aggravators: (1) Smith was previously convicted of another capital felony or a felony involving the threat of violence; (2) the murder was committed during the course of a kidnapping; (3) the murder was committed for pecuniary gain; (4) the murder was committed to avoid detection; and (5) the murder was heinous, atrocious, or cruel.
[4] The court found and weighed the following nonstatutory mitigation: Smith's contribution to society and performance of exemplary deeds, little weight; Smith is loved by children, is a good father, son, brother, boyfriend, father figure, and advisor to loved ones, little weight; Smith respected his elders and helped others in need, little weight; Smith is considerate of fellow inmates, very little weight; Smith suffers from alcoholism and was under the influence of alcohol or drugs at the time of the offense, substantial weight; and the codefendants' life sentences, some weight.
[5] The trial court also sentenced Smith to life imprisonment with a fifteen-year minimum mandatory sentence as a habitual violent offender for the attempted first-degree murder conviction, the two kidnapping convictions, the burglary conviction, and the conspiracy to commit murder conviction. On the remaining counts in the indictment, the trial court sentenced Smith to thirty years' imprisonment with a ten-year minimum mandatory sentence as a habitual violent offender. Each of these sentences was to run consecutive to the death sentence. We affirm each of these sentences and only reverse the death sentence.
[6] These issues are: (1) whether the trial court erred in denying Smith's challenges for cause against several jurors; (2) whether the trial court erred in granting the State's challenge for cause against a prospective juror; (3) whether the trial court erred in granting the State's use of a peremptory challenge against an African-American prospective juror; (4) whether the trial court's failure to provide Smith relief when Smith became ill violated Smith's rights to due process, to be present at an essential stage of the trial, and to assist in his own defense; (5) whether the trial court erred in failing to suppress Smith's confession; (6) whether the trial court erred in failing to sever Smith's trial from his codefendants' trial; (7) whether the trial court abused its discretion in admitting evidence of Smith's uncharged sexual battery upon the female victim; and (8) whether the trial court abused its discretion in denying Smith's motion for mistrial based upon prosecutorial misconduct.
[7] These issues are: (9) whether the trial court abused its discretion in excluding evidence in the penalty phase; (10) whether the trial court abused its discretion in failing to sever Smith's penalty phase proceedings from his codefendants' proceedings; (11) whether the trial court abused its discretion in denying Smith's motion to strike the entire penalty phase jury based upon prosecutorial misconduct; (12) whether the trial court erred in finding sufficient evidence of the pecuniary gain and avoid arrest aggravators; (13) whether the death penalty is proportional; (14) whether the jury was misled to the significance of its advisory verdict; (15) whether the trial court erred in refusing to instruct the jury on the meaning of a life sentence and parole eligibility; and (16) whether the death penalty statute is constitutional.
[8] In his initial brief, Smith additionally claimed error as to a fourth prospective juror, juror Nieves. However, Smith conceded in his reply brief filed in this case that any error in the denial of this challenge was harmless.
[9] A proper objection includes: (1) a timely objection on the basis asserted; (2) a showing that the juror is a member of a distinct racial group; and (3) a request that the court ask the striking party the reason for the strike. Melbourne, 679 So.2d at 764.
[10] An arraignment of Cobb, Nolden, Glass, and Austin was held before Judge Pineiro. Each of these defendants were represented by counsel at this proceeding.
[11] After a conflict later arose between Smith and Robinson, Robinson withdrew from representing Smith.
[12] We similarly reject Smith's alternative argument that the waiver of the Miranda rights was not valid because the officers did not advise Smith that he had already been indicted. See Traylor v. State, 596 So.2d 957 (Fla.1992).
[13] In Owen v. State, 596 So.2d 985 (Fla.1992), we noted that the federal court's interpretation of "arraignment" means the initial or first appearance before a committing magistrate.
[14] The Court did note that not all Sixth Amendment challenges to postindictment questioning will fail if the challenged practice would pass muster under Miranda. Instead, the Court found that it would take a pragmatic approach to the waiver question to determine the scope of the Sixth Amendment right to counsel and the type of warning required for a valid waiver of that right. Patterson, 487 U.S. at 297-98, 108 S.Ct. at 2397-98. We agree with this pragmatic approach and find that under the circumstances of this case the waiver was sufficient.
[15] Smith cites to our decision in Anderson v. State, 420 So.2d 574 (Fla.1982), in support of his position; however, that case is distinguishable. In Anderson, Florida officials interrogated the defendant after indictment during a four-day trip returning the defendant to Florida from Minnesota. In that case, we found a Sixth Amendment violation on the basis that the defendant mentioned that he expected to receive appointed counsel when he returned to Florida. Id. at 576. Further, from the record, we found that there was no valid waiver of the right to counsel in light of the fact he made these incriminating statements towards the end of the trip, which was after the twenty-four hour period in which he would have been taken before a judicial officer under Florida Rule of Criminal Procedure 3.130(b). Id. Anderson is distinguishable from the case at bar because we find that Smith did not make any assertion of the right to counsel and that there is nothing in the record to show that Smith's waiver was anything but voluntary.
[16] The State indicated it would not introduce the complete original statements into evidence, but it would create a redacted copy for use in conducting examination of the witnesses. During examination, the State moved for introduction of the redacted statements into evidence. The State asserted that it wanted the original statements to be introduced with portions deleted and other words typed onto the statement because the State wanted the jury to see the signature sheet and the codefendant's initials on each page. Defense counsel objected, arguing that the jury could properly receive the trial transcription of the redacted statements. Otherwise, the defendants argued, the defendants would be prejudiced by the obvious redaction. After considering the arguments, the trial court determined that the State's proposal would be followed.
[17] Also, the Court noted that to hold otherwise would result in fewer joint trials, trials which "generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." Marsh, 481 U.S. at 210, 107 S.Ct. at 1709.
[18] In Franqui, we specifically pointed to the portion of Cruz which stated:

We hold that, where a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant... the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him. Of course, the defendant's confession may be considered ... on appeal in assessing whether any Confrontation Clause violation was harmless ....
Cruz, 481 U.S. at 193-94, 107 S.Ct. at 1719 (emphasis added).
[19] We find no merit to Smith's other claims of prosecutorial misconduct in the guilt phase. See Dufour v. State, 495 So.2d 154 (Fla.1986); State v. Sheperd, 479 So.2d 106 (Fla.1985); White v. State, 377 So.2d 1149 (Fla.1979).